# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Maxwell Hansen and Eileen Chang, individually and on behalf of all others similarly situated, | No. _____ |
| Plaintiffs. | |
| v. | **JURY TRIAL DEMANDED** |
| Northwestern University, College Board, American University, Baylor University, Boston College, Boston University, Brandeis University, Brown University, California Institute of Technology, Carnegie Mellon University, Case Western Reserve University, The Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, Duke University, Emory University, Fordham University, George Washington University, Georgetown University, Harvard University, The Johns Hopkins University, Lehigh University, Massachusetts Institute of Technology, University of Miami, New York University, Northeastern University, University of Notre Dame du Lac, The Trustees of the University of Pennsylvania, William Marsh Rice University, University of Rochester, University of Southern California, Southern Methodist University, Stanford University, Syracuse University, Tufts University, Tulane University, Villanova University, Wake Forest University, Washington University in Saint Louis, Worcester Polytechnic Institute, and Yale University, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   JURISDICTION AND VENUE ........................................................5

III.  THE PARTIES ...................................................................................6

      A.    Plaintiffs .................................................................................6

      B.    Defendants.............................................................................8

IV.  TUITION COSTS AND STUDENT DEBT HAVE
      INCREASINGLY BURDENED STUDENTS AND THEIR
      FAMILIES ........................................................................................21

V.    DEFENDANTS' VIOLATION OF THE ANTITRUST LAWS .................25

      A.    Defendants collectively participate in the College Board
            that develops a shared financial aid methodology used by
            all University Defendants ......................................................25

      B.    Defendants collectively developed the NCP Agreed
            Pricing Strategy ....................................................................27

      C.    Since 2006, College Board and the University
            Defendants have collectively used the NCP Agreed
            Pricing Strategy ....................................................................31

      D.    The University Defendants Participate In, Facilitate, and
            Implement the Conspiracy related to the NCP Agreed
            Pricing Strategy ....................................................................32

VI.  EFFECTS OF THE CONSPIRACY .............................................34

VII. RELEVANT MARKET AND DEFENDANTS' MARKET
      POWER ..............................................................................................35

VIII. CONTINUING ACCRUAL AND THE DISCOVERY RULE ...................42

      A.    Continuous accrual................................................................42

      B.    The discovery rule.................................................................42

IX.   CLASS ALLEGATIONS ................................................................................43

X.    CLAIM FOR RELIEF ...................................................................................46

COUNT 1 SHERMAN ACT SECTION 1 ...............................................................46

REQUEST FOR RELIEF .........................................................................................48

DEMAND FOR JURY TRIAL .................................................................................49

Plaintiffs, Maxwell Hansen and Eileen Chang, individually and on behalf of all others similarly situated, bring this class action under Section 1 of the Sherman Act against College Board, American University, Baylor University, Boston College, Boston University, Brandeis University, Brown University, California Institute of Technology, Carnegie Mellon University, Case Western Reserve University, The Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, Duke University, Emory University, Fordham University, George Washington University, Georgetown University, Harvard University, The Johns Hopkins University, Lehigh University, Massachusetts Institute of Technology, University of Miami, New York University, Northeastern University, Northwestern University, University of Notre Dame du Lac, The Trustees of the University of Pennsylvania, William Marsh Rice University, University of Rochester, University of Southern California, Southern Methodist University, Stanford University, Syracuse University, Tufts University, Tulane University, Villanova University, Wake Forest University, Washington University in Saint Louis, Worcester Polytechnic Institute, and Yale University (collectively, "Defendants").

## I. INTRODUCTION

1. Paying for college is one of the landmark financial burdens millions of students and parents face. Families often spend years planning and saving to pay for

- 1 -

college and many incur long lasting debt, sometimes debt they cannot afford. It's always been a major financial burden and has gotten worse in the last two decades. University students' tuition debts have skyrocketed. According to the Board of Governors of the U.S. Federal Reserve System, Student Loans Owned and Securitized in the first quarter of 2006 were almost $481 billion dollars.[1] In the second quarter of 2024, those debts grew to $1.745 *trillion*.[2] From 1980 to 2020, the average price of tuition, fees, room, and board for an undergraduate degree increased by 169% in constant 2019 dollars, according to Georgetown University.[3] But over the same 40-year period, earnings for workers ages 22 to 27 only increased by 19% in constant 2019 dollars.[4] "It used to be possible to work one's way through college; today, college costs are generally too high—and young people's wages too low—for that to be feasible. Consequently, more students have to take on larger amounts of debt to get a college degree."[5]

2.    The Defendants' conduct at issue here has only made matters worse. Beginning in 2006 and continuing to the present defendant College Board and

---

[1] https://fred.stlouisfed.org/series/SLOAS#.

[2] *Id.*

[3] https://repository.library.georgetown.edu/bitstream/handle/10822/1062945/cew-all_one_system-fr.pdf?sequence=1&isAllowed=y, p.13.

[4] *Id.*

[5] *Id.*, p. 12 (footnotes omitted).

defendant universities (the "University Defendants") exacerbated those student debt problems.[6] In violation of Section 1 the Sherman Act, 15 U.S.C. § 1, Defendants have engaged in concerted action to require a noncustodial parent of any applicant seeking non-federal financial aid to provide financial information (the "NCP Agreed Pricing Strategy"). That concerted action substantially raised the prices that Plaintiffs and Class members pay to attend college. Absent this agreement the University Defendants would have competed in offering financial aid in order to enroll their top candidates.

3.      Defendant College Board sets certain standards related to financial aid. College Board member institutions include the University Defendants. Starting in 2006, College Board made an intentional push to require schools to agree to the consideration of the income and assets of noncustodial parents when making financial aid determinations. The effort was led and organized by individuals from the University Defendants.

4.      The efforts of Defendants were successful as the University Defendants collectively agreed to consider the income and assets (hereinafter, collectively "assets") of noncustodial parents when making financial aid determinations. Currently, all University Defendants have committed to the NCP Agreed Pricing

---

[6] "University Defendants" are all defendants except for the College Board.

Strategy and require applicants seeking financial aid to submit a CSS Profile, which is "an online application used by colleges and scholarship programs to award non-federal institutional aid."[7] The application is "submitted through the sign on link available at cssprofile.org."[8] "Each year CSS Profile unlocks access to more than $10 billion in nonfederal aid to thousands of students."[9] Each Defendant's financial aid website provides a link to the CSS Profile website for the requirement that all noncustodial parents provide financial information as a requirement for submitting an aid application. And pursuant to the NCP Agreed Pricing Strategy each University Defendant considers the income of the noncustodial parent in determining how much aid to offer.

5.    Defendants' concerted action has unlawfully caused the net price of education to increase. Net price is the cost per student of tuition plus room and board, decreased by financial aid. The average net price for the forty Defendant universities who use the NCP Agreed Pricing Strategy is approximately $6,200 more than for the ten non-NCP universities in the top 50 private universities – indicative of the anticompetitive effects from Defendants' concerted activity.

---

[7] https://cssprofile.collegeboard.org/about.

[8] *Id.*

[9] https://cssprofile.collegeboard.org/.

6.      Defendants' conduct is *per se* anticompetitive because it constitutes an agreement between horizontal competitors related to price. And Defendants' concerted activity is also illegal under the rule of reason and "quick look" modes of analyses. The relevant geographic market is the United States. The relevant product market is defined as the 50 national universities with best average *U.S. News & World Report* ranking from 2008 through 2023 (the most recent year in which Class Members applied to any of Defendants). Together, this comprises the relevant antitrust market for elite, private Universities, which includes the forty Defendants, all of which use the NCP Agreed Pricing Strategy.

## II.     JURISDICTION AND VENUE

7.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1 and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.      This Court has jurisdiction under 28 U.S.C. § 1337 and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9.      This Court has personal jurisdiction over all Defendants based on the nationwide service provisions of Section 12 of the Clayton Act, 15 U.S.C. § 22. Moreover, each Defendant has (1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in

- 5 -

furtherance of an unlawful scheme in the United States, including in this District. Each Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District.

10. Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391(b), (c), and (d), because each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

### III.    THE PARTIES

**A.    Plaintiffs**

11. Maxwell Hansen attended American University from the fall of 2021 through the fall of 2023 and then transferred to Boston University where he is currently a student. Before applying to colleges, Hansen was required to submit a CSS Profile. As part of this process, Hansen's custodial parent and noncustodial parent were required to provide information to support his aid application. On the CSS Profile, Hansen was asked about the expected contribution he would receive from his noncustodial parent, and he answered $0. Hansen received about $15,000/year in financial aid from American University and about $20,000/year in financial aid from Boston University. He is paying the rest of his tuition with student

loans and his mother is a co-signer. As expected, Hansen's father has not contributed to his tuition. Hansen paid artificially high prices and continuing through present for American University and Boston University because of Defendants' anticompetitive practices and thereby suffered antitrust injury. Until recent weeks, Hansen did not know that Defendants had entered into the conspiracy alleged in this Complaint or that the conspiracy caused him to suffer financial harm.

12.     Eileen Chang attended Cornell University from 2017 to 2021. Before applying to colleges, Chang submitted financial aid forms including the CSS Profile. As part of this process, Chang's custodial parent and noncustodial parent were required to provide information to support her aid application. Chang's noncustodial parent is on disability and has a much higher income than her custodial parent. When Chang attended Cornell University, the tuition was around $70,000/year. She received both federal and nonfederal financial aid and all of the financial aid she received was need-based. Chang emailed Cornell University's financial aid office to ask if they could remove her noncustodial parent's income because this parent was on disability and unable to contribute. Chang's request was denied, and she was told that noncustodial parents are expected to help pay tuition. Chang's custodial parent took out a Parent Plus loan to pay for the rest of her tuition. She paid artificially high prices to attend Cornell University because of Defendants' anticompetitive practices and thereby suffered antitrust injury. Until recent weeks, Chang did not know that

Defendants had entered into the conspiracy alleged in this Complaint or that the conspiracy caused her to suffer financial harm.

**B.    Defendants**

13.    College Board develops and administers standardized methodologies related to the college admissions process, including the CSS Profile for financial aid.

14.    American University ("American") became a College Board member on October 31, 1962. American's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[10]

15.    Baylor University ("Baylor") became a College Board member on October 31, 1965. Baylor's financial aid website links to the CSS Profile website for the requirement that applicants with a noncustodial parent must comply with the NCP requirements on the CSS Profile website.[11]

16.    Boston College became a College Board member on October 31, 1952. Boston College's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[12]

---

[10] https://www.american.edu/financialaid/.

[11] https://onestop.web.baylor.edu/frequently-asked-questions#css-profile.

[12] https://www.bc.edu/bc-web/offices/student-services/financial-aid/financial-aid-forms.html.

17.    Boston University became a College Board member on October 31, 1947. Kelly Walter, who is the Associate Vice President for Enrollment & Dean of Admissions at Boston University, currently serves as a regionally elected trustee on the Board of Trustees for the College Board. Boston University's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[13]

18.    Brandeis University ("Brandeis") became a College Board member on October 31, 1954. Brandeis's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[14]

19.    Brown University ("Brown") became a College Board member on October 31, 1954. Brown's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[15]

20.    California Institute of Technology ("CalTech") became a College Board member on October 31, 1949. CalTech's financial aid website links to the

---

[13] https://www.bu.edu/finaid/how-aid-works/eligibility/parents-not-married/.

[14] https://www.brandeis.edu/student-financial-services/financial-aid/apply/index.html.

[15] https://finaid.brown.edu/apply/first-year-us.

- 9 -

CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[16]

21.    Carnegie Mellon University ("Carnegie Mellon") became a College Board member on October 31, 1930. Carnegie Mellon's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[17]

22.    Case Western Reserve University ("Case Western") became a College Board member on October 31, 1903. Case Western's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[18]

23.    The Trustees of Columbia University in the City of New York ("Columbia") became a College Board member on December 31, 1900. Jessica Marinaccio, who is the Dean of Undergraduate Admissions and Financial Aid at Columbia, currently serves as a national assembly elected trustee on the Board of Trustees for the College Board and also serves as the Chair of the College Board's CSS Financial Assistance Assembly Council. Columbia's financial aid website links

---

[16] https://www.finaid.caltech.edu/applying/forms/ncponline#:~:text=Your%20noncustodial%20parent%20can%20begin,Profile%20as%20a%20noncustodial%20parent.

[17] https://www.cmu.edu/sfs/financial-aid/undergraduate/fafsa-cssprofile.html.

[18] https://www.questbridge.org/partners/college-partners/case-western-reserve-university/application-requirements.

to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[19]

24.     Cornell University ("Cornell") became a College Board member on December 31, 1900. Cornell's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[20]

25.     Trustees of Dartmouth College ("Dartmouth") became a College Board member on October 31, 1907. Dartmouth's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[21]

26.     Duke University ("Duke") became a College Board member on October 31, 1950. Christoph Guttentag, who is the Dean of Undergraduate Admission at Duke, currently serves as a national assembly elected trustee on the Board of Trustees for the College Board. Miranda McCall, who is Senior Associate

---

[19] https://cc-seas.financialaid.columbia.edu/content/14-15-css-noncustodial-profile-continuing.

[20] https://finaid.cornell.edu/apply-for-aid/first-year-and-transfer-students-us; https://finaid.cornell.edu/special-circumstances/family-circumstances.

[21] https://admissions.dartmouth.edu/glossary-term/css-profile; https://admissions.dartmouth.edu/glossary-question/what-if-my-parents-are-divorced-or-separated#:~:text=Dartmouth%20believes%20that%20both%20biological,information%20from%20the%20noncustodial%20parent.

Director of Financial Support at Duke, "has served as financial aid's regional representative to the College Board" and "serves on the [College Board's] Financial Aid Standards and Services Advisory Committee (FASSAC), responsible for informing Institutional Methodology policy and practice."[22] Duke's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[23]

27.     Emory University ("Emory") became a College Board member on October 31, 1951. Emory's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[24]

28.     Fordham University ("Fordham") became a College Board member on October 31, 1952. Fordham's financial aid website links to the CSS Profile website

---

[22] https://forms.hr.duke.edu/training/leadership/scholars/profile.php?profileid=100447/.

[23] https://financialaid.duke.edu/forms-resources/faq/all-parent-faqs/; https://admissions.duke.edu/financial-support/#apply.

[24] https://studentaid.emory.edu/undergraduate/apply/new-students/index.html (under "Submit Your Tax Documents").

and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[25]

29.     George Washington University ("George Washington") became a College Board member on October 31, 1948. Elizabeth Chacko, who is a Professor of Geography and International Affairs at George Washington, currently serves as a nationally elected trustee on the Board of Trustees for the College Board. George Washington's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[26]

30.     Georgetown University ("Georgetown") became a College Board member on October 31, 1949. Georgetown's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[27]

31.     Harvard University ("Harvard") became a College Board member on October 31, 1904. Jessica Bryan, who is the Associate Director of Financial Aid and

---

[25] https://www.fordham.edu/undergraduate-financial-aid/how-to-apply/prospective-and-incoming-students-us-citizens-and-eligible-non-citizens/regular-decision/.

[26] https://financialaid.gwu.edu/policy-parental-contribution-dependent-students; https://financialaid.gwu.edu/how-apply.

[27] https://bulletin.georgetown.edu/expenses-and-financialassistances/studentfinancialservices/.

Senior Admissions Officer at Harvard, currently serves on the College Board's CSS Financial Assistance Assembly Council. Harvard's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[28]

33.    The Johns Hopkins University ("Johns Hopkins") became a College Board member on December 31, 1900. Thomas McDermott, who is the Associate Vice Provost for Financial Aid & Executive Director for Student Financial Services at Johns Hopkins, currently serves as a national assembly elected trustee on the Board of Trustees for the College Board and also serves on the College Board's CSS Financial Assistance Assembly Council, of which he is the Past Chair. Johns Hopkins's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[29]

33.    Lehigh University ("Lehigh") became a College Board member on October 31, 1941. Lehigh's financial aid website links to the CSS Profile website

---

[28] https://college.harvard.edu/resources/faq/what-should-i-do-if-css-profile-noncustodial-household-missing.

[29] https://sfs.jhu.edu/frequently-asked-questions/ ("My parents are divorced/separated. Are there any other forms that must be completed?").

and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[30]

34.    Massachusetts Institute of Technology ("MIT") became a College Board member on October 31, 1902. Leslie Bridson, who is the Director of Student Financial Services at MIT, currently serves on the College Board's CSS Financial Assistance Assembly Council. MIT's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[31]

35.    University of Miami ("Miami") became a College Board member on October 31, 1965. Miami's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[32]

36.    New York University ("NYU") became a College Board member on December 31, 1900. MJ Knoll-Finn, who is the Senior Vice President for Enrollment Management at NYU, currently is a regionally elected trustee on the Board of Trustees of the College Board. NYU's financial aid website links to the CSS Profile

---

[30] https://www.lehigh.edu/~infao/forms/(DIV1)_Noncus_Parent_Profile_Instructions.pdf.

[31] https://sfs.mit.edu/undergraduate-students/apply-for-aid/domestic/.

[32] https://finaid.miami.edu/applying-for-aid/prospective-current-student/index.html.

website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[33]

37.    Northeastern University ("Northeastern") became a College Board member on October 31, 1957. Northeastern's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[34]

38.    Northwestern University ("Northwestern") became a College Board member on October 31, 1946. Northwestern's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[35]

39.    University of Notre Dame du Lac ("Notre Dame") became a College Board member on October 31, 1947. Notre Dame's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[36]

---

[33] https://www.nyu.edu/admissions/financial-aid-and-scholarships/applying-and-planning-for-undergraduate-aid/how-to-apply/regular-decision.html.

[34] https://studentfinance.northeastern.edu/applying-for-aid/undergraduate/how-to-apply/#:~:text=Students%20whose%20biological%20parents%20are,University's%20school%20code%20is%203667.

[35] https://undergradaid.northwestern.edu/information-for/parents/divorced-separated.html.

[36] https://financialaid.nd.edu/apply-or-renew/first-year-applicants/.

40.    The Trustees of the University of Pennsylvania ("Penn") became a College Board member on December 31, 1900. William Schilling, former director of student financial aid at Penn, formerly served on the College Board's Financial Aid Standards and Services Advisory Committee and the College Board's CSS Financial Assistance Assembly Council.[37] Penn's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[38]

41.    William Marsh Rice University ("Rice") became a College Board member on October 31, 1955. Rice's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[39]

42.    University of Rochester ("Rochester") became a College Board member on October 31, 1936. Rochester's financial aid website links to the CSS

---

[37] https://allaccess.collegeboard.org/remembering-bill-schilling.

[38] https://srfs.upenn.edu/financial-aid/undergraduate-aid-program/how-we-determine-need#:~:text=Non%2DCustodial%20Parents&text=In%20order%20to%20be%20considered,on%20the%20College%20Board%20website.

[39] https://financialaid.rice.edu/expected-family-contribution; https://financialaid.rice.edu/forms-resources/frequently-asked-questions ("What if my parents are divorced?").

Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[40]

43.     University of Southern California ("USC") became a College Board member on October 31, 1928. Kedra Ishop, who is Vice President for Enrollment Management at USC, currently serves as a nationally elected trustee on the Board of Trustees of the College Board. USC's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[41]

44.     Southern Methodist University ("SMU") became a College Board member on October 31, 1959. SMU's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[42]

45.     Stanford University ("Stanford") became a College Board member on October 31, 1939. Stanford's financial aid website links to the CSS Profile website

---

[40] https://www.rochester.edu/financial-aid/css-profile/.

[41] https://www.admissionblog.usc.edu/p/usc-fast-facts-your-guide-to-financial.

[42] https://www.smu.edu/enrollmentservices/financialaid/process/helpfulhints/undergraduate.

- 18 -

and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[43]

46.  Syracuse University ("Syracuse") became a College Board member on October 31, 1942. Syracuse's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[44]

47.  Tufts University ("Tufts") became a College Board member on October 31, 1910. Tufts's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[45]

48.  Tulane University ("Tulane") became a College Board member on October 31, 1957. Tulane's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[46]

49.  Villanova University ("Villanova") became a College Board member on October 31, 1954. Villanova's financial aid website links to the CSS Profile

---

[43] https://financialaid.stanford.edu/undergrad/apply/requirements/rd_us.html.

[44] https://financialaid.syr.edu/howtoapply/undergrad/noncustodial-profile-ncp/.

[45] https://students.tufts.edu/financial-services/undergraduate-aid/aid-awarding/divorced-or-separated-parents.

[46] https://financialaid.tulane.edu/apply/aid.

website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[47]

50. Wake Forest University ("Wake Forest") became a College Board member on October 31, 1961. Wake Forest's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[48]

51. Washington University in Saint Louis ("Washington University") became a College Board member on October 31, 1959. Ronné P. Turner, who is Vice Provost for Admissions and Financial Aid at Washington University, was Chair of the Board of Trustees for the College Board from 2020 to 2022 and currently serves on the Board of Trustees. Michael Runiewicz, who is the Assistant Vice Provost & Director of Student Financial Services at Washington University, currently serves on the College Board's CSS Financial Assistance Assembly Council. Washington University's financial aid website links to the CSS Profile website and requires that

---

[47] https://www1.villanova.edu/university/office-of-financial-assistance/financial-aid-process/first-year-students.html (under "Submit Your Profile").

[48] https://financialaid.wfu.edu/resources/policies/#20220808171306.

applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[49]

52.     Worcester Polytechnic Institute ("Worcester") became a College Board member on October 31, 1956. Worcester's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[50]

53.     Yale University ("Yale") became a College Board member on October 31, 1909. Yale's financial aid website links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile.[51]

## IV.    TUITION COSTS AND STUDENT DEBT HAVE INCREASINGLY BURDENED STUDENTS AND THEIR FAMILIES

54.     As the New York Times reports, "There are few challenges facing students more daunting than applying and paying for college."[52] "Saving and paying for college is an endurance test, a forced march on an often 50-year parade, where

---

[49] https://financialaid.wustl.edu/applying-for-aid/first-time-applicants/#:~:text=The%20Noncustodial%20Parent%20Profile%20is,parents%20are%20separated%20or%20divorced (under "Submit the CSS Profile").

[50] https://www.wpi.edu/faq/my-parents-are-divorced-separated-and-they-share-custody-which-considered-noncustodial-parent.

[51] https://finaid.yale.edu/forms/css-profile; https://finaid.yale.edu/award-letter/financial-aid-terminology/parent-share.

[52] https://www.nytimes.com/interactive/2023/business/college-payment-loans.html.

strange numerical codes and senseless jumbles of letters mark a route that Waze can't map."[53] And as the New York Times further reports, "Admitted to a great school? Good, but the grant money it offers based on that [student aid index] or other data or the figures that another form, the CSS Profile, belches out is probably not enough to make college affordable. So you could apply for a federal PLUS loan for parents, which might take you 25 years to repay."[54]

55.     The Washington Post reports that as a result of the difficulties of paying for college, "[s]ome 45 million Americans have debt from student loans totaling more than $1.7 trillion. People have now borrowed more for education than for anything else except houses."[55] Total student debt is greater than debt from auto loans and credit cards combined.[56]

56.     The average debt of graduates varies based on the type of institution according to *U.S. News & World Report* data. Graduates in 2022 from a ranked private college borrowed more on average, at $23,627, than public college graduates,

---

[53] https://www.nytimes.com/2024/01/18/business/college-tuition-money.html.

[54] *Id.*

[55] https://www.washingtonpost.com/books/2024/09/10/burdened-student-debt-crisis-review-liebenthal/.

[56] https://www.cfr.org/backgrounder/us-student-loan-debt-trends-economic-impact.

who took out $20,371.[57] "Borrowing is often tied to the cost of college tuition and fees, which, per *U.S. News & World Report* data, has more than doubled over the last 20 years across ranked private and public National Universities (schools that are often research-oriented and offer bachelor's, master's and doctoral degrees)."[58]

57.     According to William Boffi, vice president of enrollment management at Assumption University in Massachusetts. "There's a lot written about student loan debt hampering young peoples' ability to hit other milestones, like borrowing for a house and stuff like that. And I think that becomes more true when students go into default and the credit is affected more than just the fact that they have debt."[59]

58.     High levels of student debt can significantly impact students' academic performance. It can be difficult for students to allocate sufficient time and energy to their coursework when they are preoccupied with financial concerns.[60] Research has shown for nearly two decades that higher levels of student loan debt are associated with lower academic achievement among students, as well as reduced course loads

---

[57] https://www.usnews.com/education/best-colleges/paying-for-college/articles/see-how-student-loan-borrowing-has-changed.

[58] *Id.*

[59] *Id.*

[60]     https://www.igradfinancialwellness.com/blog/the-hidden-cost-of-student-debt-how-universities-can-help-break-the-cycle#:~:text=Research%20has%20shown%20for%20nearly,and%20even%20lower%20graduation%20rates.

and even lower graduation rates.[61] The negative effects of student debt on academic success are more pronounced for low-income college students, as a large percentage of low-income students ultimately drop out due to financial concerns.[62]

59.     Moreover, research has shown that when students accumulate a high level of debt, they tend to feel less self-assured, experience lower financial well-being, and suffer from increased stress.[63] Financial burdens among college students can lead to anxiety and depression, as well as a decline in academic performance.[64]

60.     According to the dean of students at Boise State University, "Due to the fact that attending college is becoming more expensive, students are trying to save money in other ways. This usually leads to food insecurity as well as housing insecurity. Around 1 in every 3 college students in the U.S. lacks enough to eat as well as stable housing. This affects students' ability to succeed academically. Food insecurity can lead to students attending campus events only looking for food, reducing their food intake to make groceries last longer, skipping meals, purchasing less nutritious food, and deciding between buying textbooks or buying food. Housing insecurity can lead to students 'couch surfing,' sleeping in their cars, or

---

[61] *Id.* (citing cssl.osu.edu/posts/documents/nsfws-key-findings-report.pdf).

[62] *Id.* (citing https://research.com/universities-colleges/college-dropout-rates).

[63] https://lebaron-black.byu.edu/the-mental-toll-of-student-debt-and-other-predictors-of-college-students-financial-stress#_edn4.

[64] *Id.*

even being homeless. All these factors may cause anxiety and stress which can adversely affect mental health."[65]

61.    The effects of student debt carry past graduation. The Federal Reserve Bank of New York reports that for "nine youth cohorts across all fifty states," tuition hikes and student debt increases "can explain between 11 and 35 percent of the observed approximate eight-percentage-point decline in homeownership for 28-to-30-year-olds over 2007-15."[66]

## V.    DEFENDANTS' VIOLATION OF THE ANTITRUST LAWS

**A.    Defendants collectively participate in the College Board that develops a shared financial aid methodology used by all University Defendants**

62.    The Board of Trustees is College Board's governing body and is elected by College Board member delegates.[67] There are thirty-one Trustees, including representatives of numerous Defendants, as alleged above. Its leaders are the chair, vice chair, immediately preceding chair, and the College Board CEO.

---

[65] https://www.boisestate.edu/deanofstudents/2021/05/05/the-increased-cost-of-college-its-impact-on-student-basic-needs/.

[66] https://www.newyorkfed.org/research/staff_reports/sr820.html#:~:text=Further%20analysis%20demonstrates%20that%20the,for%20these%20same%20nine%20cohorts.

[67] https://about.collegeboard.org/governance/our-board.

63.     The College Board has three national assemblies that provide guidance on specific issues and College Board activities related to their professional areas.[68] The CSS/Financial Assistance Assembly "considers issues, research, policies, programs, and standards related to providing financial guidance and assistance to students, including all economic aspects of postsecondary attendance, affordability, and access."[69]

64.     The current chair of the CSS/Financial Assistance Assembly Council is from Columbia University.[70] As further alleged above, representatives of numerous Defendants currently serve on that Council.

65.     FASSAC is a College Board committee that designs and implements the formula for the Institutional Methodology. Its members include "economists and representatives of selective colleges across the country."[71] Financial aid officers who serve on FASSAC are typically from the most influential College Board member institutions. On information and belief, FASSAC operates under the CSS/Financial Assistance Assembly Council.

---

[68] https://about.collegeboard.org/governance/national-assemblies. All allegations in this paragraph are based on this College Board web page.

[69] *Id.*

[70] https://forms.collegeboard.org/councils/s/.

[71] https://issuu.com/milton_academy/docs/magazine_fallof2006, at p. 23.

66.     Two principal methodologies are used to determine a college student's financial aid. The Federal Methodology is utilized by the federal government, which uses information submitted by an applicant on FAFSA (Free Application for Federal Student Aid) to determine eligibility for need-based federal funding, such as the Pell Grant. Some States also use FAFSA to assess financial aid.

67.     The Institutional Methodology is used by schools that require students to submit a CSS Profile. The FAFSA is required by all schools for federal or state aid, but approximately 250 private schools also require the CSS Profile, which has more stringent requirements for aid eligibility, to determine whether to provide additional aid beyond government aid.

68.     The Institutional Methodology is "[d]eveloped  and maintained by the College Board in partnership with financial aid leaders."[72]

69.     A key difference between the two methodologies is that only the Institutional Methodology considers noncustodial parent information, which is the subject of this lawsuit.

## B.    Defendants collectively developed the NCP Agreed Pricing Strategy

70.     Prior to 2006, schools took various approaches to considering the assets of parents in making financial aid determinations with numerous schools focusing

---

[72] https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf.

on the assets of the parents who had custody of the child. Donald Saleh, a vice president at Syracuse University, admitted that those colleges, by competing with schools that did consider the assets of both parents, could "benefit on yield" (the percentage of admitted students who enroll) by not pushing for financial information from both parents," and/or by offering "better aid packages."[73]

70.    University Defendants and the College Board worked to interfere with this competitive process where colleges took differing approaches to the consideration of noncustodial parent assets. Through concerted action, Defendants replaced that competition with the NCP Agreed Pricing Strategy. In 2006, the College Board, with prominent involvement from the University Defendants, developed the NCP Agreed Pricing Strategy related to the consideration of financial assets of noncustodial parents. The NCP Agreed Pricing Strategy was developed by the College Board's Financial Aid Standards and Services Advisory Committee.[74] Employees from various University Defendants participated in this process. The NCP Agreed Pricing Strategy was the product of a collective effort of University Defendants to agree on for the process for making financial aid determinations for students.

---

[73] https://www.insidehighered.com/news/2005/11/01/you-cant-divorce-tuition-bills.

[74] *Id.*

71.     The centerpiece of the NCP Agreed Pricing Strategy was a requirement formulated by the College Board that Noncustodial Parents ("NCPs") provide financial information as part of the Institutional Methodology. Once a student begins applying for aid, the College Board sends the student an e-mail indicating that financial information will be needed from both parents. Students were told there were no exceptions to the requirement – even if a divorce court order was issued concerning college expenses. Formulas are then used to generate a financial aid offer. The student then ultimately receives an estimate for the family contribution based on what the two parents can contribute, regardless of whether both parents do actually contribute. The family contribution is given as a lump sum and does not distinguish between parents.

72.     The College Board took active steps to cause joint adoption of the NCP Agreed Pricing Strategy. In 2006, the College Board sent letters to colleges urging them to follow the NCP Agreed Pricing Strategy and include consideration of the financial assets of noncustodial parents in making financial aid determinations.

73.     At least 75 schools immediately adopted the NCP Agreed Pricing Strategy in or around 2006. For a significant minority of students (those from single-parent families), that change essentially at least doubled their available parental assets/income practically overnight.

74. Defendants who immediately adopted the new NCP methodology in 2006 include Dartmouth, Colgate, Cornell, Fordham, Georgetown, Harvard, and the University of Chicago.

75. The College Board has explained that as to the NCP Agreed Pricing Strategy "consensus within FASSAC was reached" on several key parts of the shared approach, including:

- "There should be a consistent approach among institutions to the analysis of family data when birth/adoptive parents do not live in the same household."

- "The definition of family should be viewed as a set of relationships rather than a domestic unit."

- "[T]he standard [Institutional Methodology] [Parental Contribution] should include an assessment of the noncustodial parent's resources calculated in a format parallel to that of the custodial parent contribution."

- "The College Board is uniquely structured to serve as the facilitating center for data collection, methodology development and operational implementation."

76. The College Board's CSS Profile web page, which provides detailed information about the NCP methodology, states: "**Divorced or Separated Families**.

Some colleges may require the CSS Profile from both the custodial and noncustodial parent."[75]

## C. Since 2006, College Board and the University Defendants have collectively used the NCP Agreed Pricing Strategy

77.     From 2006 onwards, the College Board has continued to implement the NCP Agreed Pricing Strategy. The College Board currently states that "[i]f you are a noncustodial parent, you will need to create a College Board student account using your (the parent's) information."[76] The College Board explains that a "noncustodial parent is typically the parent the student did not live with most of the time during the past year."[77] Filling out a CSS Profile requires "your most recently completed tax returns, W-2 forms and other records of current year income, records of untaxed income and benefits, assets, and bank statements."

78.     The CSS Profile website sets forth "Information for Parents."[78] It has a "step-by-step guide" for "creating a separate parent account."[79] It states: "Double-check and confirm that the student is applying to any institution that requires the CSS Profile for noncustodial parents. Typically, only parents completing the

---

[75] *Id.*

[76] https://cssprofile.collegeboard.org/profile-for-parents.

[77] *Id.*

[78] https://cssprofile.collegeboard.org/help-center/what-documents-do-i-need-complete-css-profile.

[79] *Id.*

noncustodial CSS Profile should create a separate account. A list of participating institutions is available online."

**D.   The University Defendants Participate In, Facilitate, and Implement the Conspiracy related to the NCP Agreed Pricing Strategy**

79.   The University Defendants have agreed to adopt, promote, and implement the NCP Agreed Pricing Strategy promulgated by the College Board through their involvement in College Board governance and their adoption of the NCP standards. By participating in an association which collectively sets standards related to financial aid, the University Defendants have joined the conspiracy and played a key role in its implementation and enforcement.

80.   The University Defendants participate in, implement, and facilitate the conspiracy in at least three ways: (1) University Defendant employees attend College Board meetings, supervise College Board operations, and participate in the development of College Board aid methodologies and related standards; (2) University Defendants implement the NCP Agreed Pricing Strategy related to noncustodial parent financial assets; and (3) University Defendants require students to submit aid information related to noncustodial parents and include that information in their determination of need-based financial aid.

81.   First, as alleged above, representatives from the University Defendants regularly attend College Board meetings and have held various leadership positions in the organization from 2006 to the present.

- 32 -

82. Second, the University Defendants, through their representatives, were involved in the development of the NCP Agreed Pricing Strategy starting in 2006. For example, Sally Donahue, Harvard's Director of Financial Aid, was the chair of FASSAC at the time that the strategy was developed. Donald Feehan, a vice president at Syracuse, was involved in the FASSAC that developed the strategy. The University Defendants also played a role in advocating for the adoption and implementation of the new standards. For example, Julia Benz, a director of financial aid at Rice, in 2006 made public statements advocating for the changes made by the College Board.[80]

83. Third, the University Defendants each currently require the submission of information related to noncustodial parent assets and include it in their determination of need-based financial aid, consistent with the NCP Agreed Pricing Strategy. The College Board lists all institutions that require the submission of noncustodial parent financial information.[81] Each University Defendant is listed as requiring students to submit financial aid information for noncustodial parents. Thus, each University Defendant currently uses the NCP Agreed Pricing Strategy.

---

[80] https://www.insidehighered.com/news/2005/11/01/you-cant-divorce-tuition-bills.

[81] https://profile.collegeboard.org/profile/ppi/participatingInstitutions.aspx.

## VI. EFFECTS OF THE CONSPIRACY

84.     The joint use of the NCP Agreed Pricing Strategy by the NCP Cartel[82] causes financial harm to Plaintiff and the Class members. Consider a FAFSA school that costs $35,000 and a Profile school that costs $75,000. A student considers both schools, but her parents are divorced. This student's custodial parent is unmarried, earns a modest income and rents a home. Her noncustodial parent earns high income, is remarried to a high earner and owns a home. The FAFSA school counts only the income of the custodial parent. The CSS Profile counts the income of the custodial parent, the noncustodial parent and the stepparent. FAFSA calculates the family contribution at $10,000, while the CSS Profile calculates it at $50,000. In this scenario, the out-of-pocket cost would be much higher for the Profile school solely because of the noncustodial parent rules.

85.     Indeed, the average net price for the forty Defendant universities is approximately $6,200 more than for the ten non-NCP schools in the top 50 private universities. Net price is tuition plus room and board less financial aid.

86.     The mere need to provide NCP information can result in disadvantaged students being unable to provide such information. In "The Most Onerous Form in

---

[82] The NCP Cartel consists of the Defendants who each participated in the implementation of the NCP Agreed Pricing Strategy.

College Admissions,"[83] *The Chronicle of Higher Education* explains that, among other problems, the NCP requirements impose onerous burdens on "students who don't live in a nuclear family. Students from single-parent homes. Students whose parents had ugly separations. Students with a parent who's abusive or imprisoned or nowhere to be found."[84] This article details the extreme difficulties experienced by those with noncustodial parents and insufficient knowledge and resources to meet all CSS Profile requirements for students with NCPs.

## VII.   RELEVANT MARKET AND DEFENDANTS' MARKET POWER

87.    Defendants' conduct is *per se* anticompetitive because it constitutes is an agreement between horizontal competitors related to price. And Defendants' conduct is also illegal under the rule of reason and "quick look" modes of analyses.

88.    To the extent necessary, Plaintiffs allege a relevant market of U.S. El Private Universities. The relevant geographic market is the United States. The relevant product market is defined as the 50 highest ranked private national universities according to *U.S. News & World Report* rankings averaged from 2008 through 2023 (the most recent year in which Class Members applied to any of

---

[83] https://www.chronicle.com/article/the-most-onerous-form-in-college-admissions (dated Feb. 23, 2021).

[84] *Id*.

Defendants). This is the Market for Elite, Private Universities. This Market includes the 40 Defendants, all of which require NCP financial information.[85]

89.    The forty Defendant universities have an 84% market share of the top fifty private schools, based on undergraduate attendance.

90.    This market does not include liberal arts colleges, which offer distinct products and are generally more like each other than like elite, private universities. Reflecting industry recognition of these discrete classifications, both *U.S. News & World Report* and the *Carnegie Classifications* classify national universities and liberal arts colleges separately. Liberal arts colleges are generally regarded as having different characteristics and services, including a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less or no emphasis on research. In contrast, private, national universities tout themselves as offering such distinct services that the liberal arts colleges do not.

91.    The Market for Elite, Private Universities has a rational relation to the interchangeability of use or cross-price elasticity of demand as to the universities in the market. That is, within this market, sufficient cross-price elasticity of demand exists such that a sufficient number of admitted students to two or more of these

---

[85] The ten universities in the Top 50 private universities that do not require NCP financial data are Gonzaga University, Loyola Marymount University, Pepperdine University, Princeton University, Rensselaer Polytechnic Institute, Santa Clara University, Vanderbilt University, and Yeshiva University.

universities would respond to a small but significant increase in the net price by one university in the market by choosing to attend a lower-priced university in the same market that would make the price increase unprofitable.

92.     The Market for Elite, Private Universities also has a rational relation to the cross-price elasticity of demand with respect to the schools outside the market. That is, the cross-price elasticity between elite, private universities and elite liberal arts colleges in the United States is low, so that a hypothetical monopolist in the Market for Elite, Private Universities could impose a small but significant non-transitory increase in price ("SSNIP") without losing so many students to elite liberal arts colleges or public universities as to render the SSNIP unprofitable.

93.     Admission to elite, private liberal arts colleges is generally less selective than admission to elite, private, national universities. According to *U.S. News & World Report*, the average admission rate of the top 10 national universities for fall 2023 was approximately 4.4%, whereas the average admission rate of the top 10 national liberal arts colleges is approximately 9%.[86]

---

[86] https://www.usnews.com/best-colleges/rankings/lowest-acceptance-rate. The top ten national universities for lowest acceptance rates are CalTech (3%), Harvard (3%), Columbia (4%), Princeton University (4%), Stanford (4%), Brown (5%), MIT (5%), University of Chicago (5%), Yale (5%), and Dartmouth (6%). The top ten national liberal arts colleges for lowest acceptance rates are Colby College (7%), Pomona College (7%), Swarthmore College (7%), Barnard College (8%), Bowdoin College (8%), Amherst College (10%), Middlebury College (10%), Williams College (10%), Claremont McKenna College (11%), and Hamilton College (12%).

94.     A further factor differentiating private universities and liberal arts colleges is the yield rate—that is, the rate at which admissions offers are accepted. Among the 50 highest ranked private universities by *U.S. News & World Report*, there is a strong correlation between the institution's rank and yield rate. Among the national liberal arts colleges, this correlation is much weaker (if it exists at all). The yield rate of Harvard and Stanford, for example, is greater than 80%, whereas the yield rate for the most highly rated private liberal arts colleges—Williams, Amherst, and Swarthmore—is usually approximately 40%.

95.     The Market for Elite, Private Universities excludes public universities. Some public universities have national rankings and selectivity comparable to elite, private universities. But competition between public universities and elite, private institutions is limited in the national market for students seeking financial aid, including the Class Members. The University of California-Los Angeles ("UCLA") and the University of California-Berkeley ("UC Berkeley"), for example, do not provide need-based financial assistance to out-of-state applicants. The University of Michigan-Ann Arbor ("Michigan") has an official policy of prioritizing financial aid for residents. The University of Virginia ("UVA") is required by law to matriculate at least two-thirds of its undergraduate student body from its pool of in-state applicants. Public, national universities generally charge a high average net price to

out-of-state students to cross-subsidize in-state students, a pricing policy that is driven by laws and political pressure that private universities do not face.

96.    Defendants have long acknowledged important distinctions between private and public universities, and that elite, private universities compete within a distinct market. In its 2001 University Plan, for example, Duke stated:

> Private research universities occupy a special place in the diverse world of American higher education because of their distinctive missions, organization, governance, and funding. They are deliberately intermediate in scope and scale between the small private colleges and the large public universities. As a group, they attract a disproportionate number of the best faculty, are highly selective in their admissions policies, create a residential educational experience that promotes interaction with the faculty and student learning outside the classroom, and provide much of the nation's leadership in research and scholarship. They are resource-intensive places, typically combining large endowments, strong philanthropic support, and external research funding with high tuition. These resources are powerfully additive in supporting the teaching and research missions of these institutions and their commitment to national and international leadership.
>
> In our consideration of the broader context in which Duke functions, it is important to discuss the dynamics of our market within American higher education. The leading private research universities have much in common, offering similar degree programs and pursing similar lines of research, yet the rivalry among them is often intense. Each institution is pursuing excellence and the public recognition that comes with it—on its own terms, seeking to create the deepest, richest, and most diverse environment possible for teaching, learning, and research and for the preparation of new leaders for our society. The leading universities compete with each other for the

- 39 -

human and financial capital they need to excel in their broadly overlapping missions.[87]

97.     Public universities and private universities make pricing decisions based on very different factors, with public institutions subject to political pressures, state laws, and dependence on expropriations from state treasuries. Compared to elite, private universities, public universities such as UCLA, UC Berkeley, UVA, and Michigan have different pricing models and compete for different students in large part.

98.     Defendants themselves have acknowledged that they compete within the Market for Elite, Private Universities. Morton Schapiro, the President of Northwestern from 2009 to 2022, is a trained economist who acknowledged this market when he stated in 2018—carefully distinguishing between universities and colleges—that "continuous efforts," including a push for more federal funding, "can accelerate improvement" and "allow NU to remain competitive against top COFHE universities."[88] COFHE stands for the Consortium on Financing Higher Education, a trade and lobbying group that describes itself as a "voluntary, institutionally-supported organization of thirty-five highly selective, private liberal arts colleges

---

[87] *Building on Excellence*, THE UNIVERSITY PLAN: DUKE UNIVERSITY (Feb. 23, 2001), https://alumni.duke.edu/magazine/articles/dukes-signature-american-higher-education.

[88] Adrian Wan, *Schapiro, Administrators Talk Research Efforts, Campus Inclusion at 'Conversations with the President'*, THE DAILY NORTHWESTERN (Apr. 12, 2018), https://dailynorthwestern.com/2018/04/12/campus/214612/.

and universities." By President Schapiro's own admission, Northwestern views itself as competing with the universities in that group.

99.     Competition in the Market for Elite, Private Universities is constrained by extremely strong brand preferences among consumers and high barriers to entry. Competition is also constrained by the fact that such institutions limit the supply of available seats, which generates scarcity and enhances their prestige. Competition in the Market for Elite, Private Universities is further constrained because applicants cannot readily substitute one institution for another since an applicant's choice is limited to universities to which he or she is admitted in a highly selective process.

100.    The NCP Cartel lacks any procompetitive benefits. Accordingly, if the rule of reason were to apply, it is not necessary for Plaintiffs to demonstrate reasonable and less restrictive alternatives are available.

101.    Defendants have substantial endowments and the proven capacity to meet the financial needs of their students without reducing their endowments (if that were even imperative), and without colluding to artificially reduce financial aid by means of the NCP Cartel.

102.    In addition, a reasonable and less restrictive alternative is for each member of the NCP Cartel to implement a fair financial-aid formula unilaterally, without entering into a conspiracy that overcharges students. No procompetitive impact that Defendants may proffer justifies the significant overcharge caused by

the conspiracy. If even relevant to any analysis under the rule of reason, there is no legitimate or significant procompetitive justification in Defendants' artificial and unlawful reduction of financial aid for applicants with a noncustodial parent.

103.   In short, Defendants' illegal conduct has significantly injured Plaintiff and Class Members by artificially reducing the financial aid they were offered and received.

## VIII.  CONTINUING ACCRUAL AND THE DISCOVERY RULE

### A.   Continuous accrual

104.   Defendants' violations of the Sherman Act occurred each and every time any Defendant engaged in conduct in furtherance of the NCP Cartel that harmed Plaintiffs and other Class Members. In the context of Defendants' price-fixing conspiracy, such conduct and violations occurred upon each transaction with Plaintiff or any Class Member at an artificially inflated net price of attendance.

105.   Defendants have engaged in continuing violations of the Sherman Act, and Plaintiff and the Class Members have paid artificially high net prices to attend Defendants' schools since that time and continuing through the present as a result of the unlawful conduct alleged in this complaint.

### B.   The discovery rule

106.   Until this year, Plaintiffs in fact did not know either (a) the extent to which Defendants conspired or (b) that the NCP Cartel caused financial injury to him and her and to the Class Members.

107.    Until the last two years, moreover, a person exercising reasonable diligence could not have discovered either (a) the extent to which Defendants conspired, or (b) that the NCP Cartel caused financial injury to Plaintiff and the Class Members.

## IX.    CLASS ALLEGATIONS

108.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All applicants for financial aid who submitted a CSS Profile to any of the defendant colleges and universities and who, at the time of applying, had a noncustodial parent (as defined by the College Board) whose financial information was used as a factor in the amount of aid awarded based on the CSS Profile.

109.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms. The Class is readily ascertainable because records of the relevant transactions should exist.

110.    Certification of Plaintiffs' claims for class-wide treatment is proper because Plaintiffs can prove the elements of their claims on a class-wide basis using

the same evidence as would be used to prove all of those elements in individual actions alleging the same claims.

111. This action has been brought and may be properly maintained under Federal Rule of Civil Procedure 23 on behalf of the Class proposed herein.

112. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege on information and belief that there are at least 20,000 Class members. The precise number of Class members is unknown to Plaintiffs. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

113. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including without limitation:

a) Whether Defendants engaged in the conduct alleged herein;

b) Whether the conduct of Defendants caused injury to the business or property of Plaintiffs and the Class members;

c) Whether the competitive harm caused by the conspiracy substantially outweighs any competitive benefits;

d) Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and the nature and extent of such injunctive relief; and

e) The appropriate class-wide measures of damages.

114. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct.

115. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

116. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the

burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, which they cannot, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## X. CLAIM FOR RELIEF

### COUNT 1
### Sherman Act section 1

117. Plaintiffs incorporate the preceding paragraphs.

118. Beginning in 2006, and continuing through the present to an extent to be determined in discovery, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid paid to Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119. In formulating and carrying out their conspiracy, Defendants have done those things that they combined and conspired to do, including but not limited to:

a)      agreeing upon a common method for the consideration of noncustodial parent assets in the determination of financial aid;

b)      participated in the establishment, implementation, and enforcement of rules and standards by the College Board related to the consideration of the assets of Noncustodial parents; and

c)      fixing, increasing, and stabilizing the amount of financial aid they offered.

120.    This conspiracy has had the anticompetitive effect of increasing the price of attendance at NCP Cartel institutions in the Elite Private University market.

121.    Plaintiffs and the Class Members have been injured and will continue to be injured in their businesses and property by paying more for attendance at Defendants than they would have paid and will pay but for the combination and conspiracy.

122.    Defendants' conspiracy is a *per se* violation of the Sherman Act. In the alternative, is a violation of the Sherman Act under the Rule of Reason or "quick look" analysis.

123.    Defendants' conduct has directly and proximately caused antitrust injury to Plaintiffs and the other Class Members. The artificially inflated net price of attendance that Plaintiffs and the other Class Members have paid to Defendants

flows directly from Defendants' price fixing and is the type of damage that the antitrust laws were designed to prevent.

124.   Plaintiffs and the Class Members are entitled to treble damages and an injunction against Defendants, preventing the violations alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   Certification of the proposed Class and appointment of Plaintiffs' counsel as Class Counsel;

B.   Joint and several liability for damages, to be trebled as permitted by law;

C.   An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

D.   A permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing to illegally conspire regarding their pricing and financial-aid policies and practices;

E.   An award of costs and attorneys' fees; and

F.   Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: October 7, 2024

Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman, ISBA #3126833
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Daniel J. Kurowski (IL Bar No: 6286656)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
(708) 628-4949
dank@hbsslaw.com

Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*