## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MAXWELL HANSEN and EILEEN CHANG, individually and on behalf of all others similarly situated, | Case No. 1:24-cv-09667 |
| Plaintiffs, | |
| v. | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, COLLEGE BOARD, AMERICAN UNIVERSITY, BAYLOR UNIVERSITY, BOSTON COLLEGE, BOSTON UNIVERSITY, BRANDEIS UNIVERSITY, BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, CARNEGIE MELLON UNIVERSITY, CASE WESTERN RESERVE UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, FORDHAM UNIVERSITY, GEORGE WASHINGTON UNIVERSITY, GEORGETOWN UNIVERSITY, HARVARD UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, LEHIGH UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, UNIVERSITY OF MIAMI, NEW YORK UNIVERSITY, NORTHEASTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, UNIVERSITY OF ROCHESTER, UNIVERSITY OF SOUTHERN CALIFORNIA, SOUTHERN METHODIST UNIVERSITY, STANFORD UNIVERSITY, SYRACUSE UNIVERSITY, TUFTS UNIVERSITY, TULANE UNIVERSITY, VILLANOVA UNIVERSITY, WAKE FOREST UNIVERSITY, WASHINGTON UNIVERSITY IN SAINT LOUIS, WORCESTER POLYTECHNIC INSTITUTE, and YALE UNIVERSITY, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

BACKGROUND ...................................................................................................4

    A.    CSS Profile And The Collection Of NCP Information............................5

    B.    Plaintiffs And Their Claims ....................................................................6

ARGUMENT .......................................................................................................8

I.    Plaintiffs Have Not Plausibly Alleged Any Agreement ...............................9

    A.    Plaintiffs Have Not Plausibly Alleged Any Agreement To Require Submission of NCP Financial Information............................................10

    B.    Plaintiffs Have Not Plausibly Alleged An Agreement To Use NCP Financial Information, Let Alone Use It In A Standardized Way, To Fix Prices ....................................................................................................14

    C.    No Plus Factors Exist To Support Plaintiffs' Claims ...........................15

    D.    Plaintiffs Have Not Plausibly Alleged Any Defendant's Specific Participation In The Purported Agreement ............................................17

II.    Plaintiffs Have Not Plausibly Alleged Anticompetitive Conduct ...................19

    A.    Plaintiffs Do Not Allege A Plausible *Per Se* Or Quick-Look Claim.....................19

    B.    Plaintiffs Fail To Plead A Plausible Rule Of Reason Claim ...............................22

        1.    Plaintiffs Fail To Plead Direct Evidence Of Anticompetitive Harm .........22

        2.    Plaintiffs Fail To Plead Indirect Evidence Of Anticompetitive Harm Because The Alleged Relevant Market Is Implausible...................25

III.    Plaintiffs Fail To Plausibly Allege Antitrust Injury And Antitrust Standing ..................30

IV.    Plaintiff Chang's Claim Is Time-Barred.................................................33

    A.    The Discovery Rule Does Not Save Chang's Untimely Claim .............34

    B.    The Continuing Violation Doctrine Does Not Apply ...........................37

CONCLUSION....................................................................................................39

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ................................................................22

*Agnew v. National Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) ........................................................9, 21

*Anderson News LLC v. American Media, Inc.*,
    899 F.3d 87 (2d Cir. 2018)................................................................16

*Associated General Contractors of California, Inc. v. California State Council of
    Carpenters*,
    459 U.S. 519 (1983)...........................................................................30

*Association of American Physicians & Surgeons, Inc. v. American Board of
    Medical Specialties*,
    2020 WL 5642941 (N.D. Ill. Sept. 22, 2020) ..................................26

*Association of American Physicians & Surgeons, Inc. v. American Board of
    Medical Specialties*,
    2017 WL 6821094 (N.D. Ill. Dec. 13, 2017) ...................................20

*Bank of America, N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ..................................................9, 17, 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................. *passim*

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) .....................................................15

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ..........................................................23

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir 2012) ...............................................................5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...........................................................................30

*Bunker Ramo Corp. v. United Business Forms, Inc.*,
    713 F.2d 1272 (7th Cir. 1983) ..........................................................20

*Cancer Foundation, Inc. v. Cerberus Capital Management, LP*,
  559 F.3d 671 (7th Cir. 2009) ...................................................35

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F. 2d 1101 (7th Cir. 1984) ...............................................27

*Chicago Studio Rental, Inc. v. Illinois Department of Commerce*,
  940 F.3d 971 (7th Cir. 2019) ..................................................32

*Choh v. Brown University*,
  -- F. Supp. 3d --, 2024 WL 4465476 (D. Conn. Oct. 10, 2024)..................20, 29, 38

*DeBartolo v. United Healthcare Services, Inc.*,
  2010 WL 3420316 (N.D. Ill. Aug. 27, 2010) ......................35

*Dent v. Charles Schwab & Co.*,
  121 F.4th 1352 (7th Cir. 2024) ...............................................33

*Ducere LLC v. Enbridge (U.S.) Inc.*,
  2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ...............................25

*Farag v. Health Care Service Corp.*,
  2017 WL 2868999 (N.D. Ill. July 5, 2017)..............................37

*Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ..................................................30

*Greco v. Mallouk*,
  2024 WL 4119169 (N.D. Ill. Sept. 9, 2024) ......................10, 16

*Havoco of America, Ltd. v. Shell Oil Co.*,
  626 F.2d 549 (7th Cir. 1980) ..................................................22

*Henry v. Brown University*,
  621 F. Supp. 3d 878 (N.D. Ill. 2022) ......................29, 37, 38

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ...............................................34

*Hoagland v. Town of Clear Lake, Indiana*,
  344 F. Supp. 2d 1150 (N.D. Ind. 2004) .................................35

*Hull v. Burwell*,
  66 F. Supp. 3d 278 (D. Conn. 2014).......................................31

*In re Copper Antitrust Litigation*,
  436 F.3d 782 (7th Cir. 2006) ..................................................34

*In re EpiPen Direct Purchaser Litigation*,
  2022 WL 1017770 (D. Minn. Apr. 5, 2022) ........................................................13

*In re High Fructose Corn Syrup Antitrust Litigation*,
  295 F.3d 651 (7th Cir. 2002) ...........................................................................10

*In re Humira (Adalimumab) Antitrust Litigation*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020) ...............................................22, 30, 32, 33

*In re Insurance Brokerage Antitrust Litigation*,
  618 F.3d 300 (3d Cir. 2010)..............................................................................12

*In re Local TV Advertising Antitrust Litigation*,
  2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .......................................................16

*In re Musical Instruments & Equipment Antitrust Litigation*,
  798 F.3d 1186 (9th Cir. 2015) ..........................................................................13

*In re Outpatient Medical Center Employee Antitrust Litigation*,
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ..................................................................5

*In re Processed Egg Products Antitrust Litigation*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ................................................................24

*In re Sulfuric Acid Antitrust Litigation*,
  703 F.3d 1004 (7th Cir. 2012) .....................................................................19, 36

*In re Sulfuric Acid Antitrust Litigation*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ................................................................21

*In re Text Messaging Antitrust Litigation*,
  630 F.3d 622 (7th Cir. 2010) ......................................................................10, 16

*International Equipment Trading, Ltd. v. AB SCIEX LLC*,
  2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) ................................................25, 26

*Jacobs v. Tempur Pedic International, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ........................................................................23

*Kleen Products LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ............................................................................17

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)..........................................................................................34

*Kochert v. Greater Lafayette Health Services, Inc.*,
  463 F.3d 710 (7th Cir. 2006) ............................................................................30

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ...................................................................................19, 21

*Loeb Industries, Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) .....................................................................30, 33

*Marion Diagnostic Center, LLC v. Becton Dickinson & Co.*,
    29 F.4th 337 (7th Cir. 2022) ................................................................12, 13, 15

*Mathews v. Kidder, Peabody & Co.*,
    260 F.3d 239 (3d Cir. 2001)................................................................................34

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ............................................................................38

*MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*,
    2019 WL 11658793 (N.D. Ill. Jan. 25, 2019) ...............................................17

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
    385 F. Supp. 2d 740 (N.D. Ill. 2005) ..............................................................20

*Nucap Industries, Inc. v. Robert Bosch LLC*,
    273 F. Supp. 3d 986 (N.D. Ill. 2017) ..............................................................28

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)....................................................................................22, 25

*Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*,
    2020 WL 6134982 (N.D. Ill. Oct. 19, 2020)................................................23

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ............................................................................15

*Patel v. University of Vermont*,
    2021 WL 4523683 (D. Vt. Oct. 1, 2021) ......................................................31

*Preuher v. Seterus, LLC*,
    2014 WL 7005095 (N.D. Ill. Dec. 11, 2014) ..................................................5

*Prosser v. Becerra*,
    2 F.4th 708 (7th Cir. 2021) ..............................................................................31

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..............................................................................28

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*,
    412 F. Supp. 3d 941 (N.D. Ill. 2019) ..............................................................25

*Republic Tobacco Co. v. North Atlantic Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ............................................................................25

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ............................................................................30

*Slep-Tone Entertainment Corp. v. Elwood Enterprises, Inc.*,
    165 F. Supp. 3d 705 (N.D. Ill. 2015) ..................................................................9

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ............................................................................................19

*Tomlinson v. Goldman, Sachs & Co.*,
    682 F. Supp. 2d 845 (N.D. Ill. 2009) ................................................................36

*United States Board of Oral Implantology v. American Board of Dental
    Specialties*,
    390 F. Supp. 3d 892 (N.D. Ill. 2019) ................................................................17

*United States v. Brown University*,
    5 F.3d 658 (3d Cir. 1993).............................................................................20, 22

*United States v. Duke*,
    229 F.3d 627 (7th Cir. 2000) ............................................................................35

*UNR Industries, Inc. v. Continental Insurance Co.*,
    607 F. Supp. 855 (N.D. Ill. 1984) ....................................................................20

*Vital Pharmaceuticals, Inc. v. Berlin Packaging LLC*,
    632 F. Supp. 3d 780 (N.D. Ill. 2022) ................................................................22

*Washington County Health Care Authority, Inc. v. Baxter International Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................12, 15, 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971)......................................................................................33, 37

**Federal Statutes**

15 U.S.C. § 1 ...........................................................................................3, 8, 9, 23

15 U.S.C. § 15b............................................................................................................33

**Other Authorities**

*2025-2026 Participating Institutions and Programs*, COLLEGE BOARD,
    https://profile.collegeboard.org/profile/ppi/participatinginstitutions.aspx ...............................6

*Best National University Rankings*, U.S. NEWS & WORLD REPORT,
    https://www.usnews.com/best-colleges/rankings/national-
    universities?_sort=rank&_sortDirection=asc ........................................................8, 26, 28, 29

*Building on Excellence: The University Plan*, DUKE UNIV. 5 (Feb. 23, 2001),
    https://alumni.duke.edu/magazine/articles/dukes-signature-american-higher-
    education ...................................................................................................................27

Carnegie Classifications...................................................................................................26

Jaschik, *You Can't Divorce Tuition Bills*, INSIDE HIGHER ED (Oct. 31, 2005),
    https://www.insidehighered.com/news/2005/11/01/you-cant-divorce-tuition-
    bills..............................................................................................................................5

Kaye & Freedman, REFERENCE GUIDE ON STATISTICS, IN REFERENCE MANUAL
    ON SCIENTIFIC EVIDENCE 211 (Fed. Judicial Ctr., 3d ed. 2011).............................25

**<u>INTRODUCTION</u>**

Each year, colleges and universities award tens of billions of dollars in grants to students whose families would otherwise be unable to afford tuition.  Schools award this large amount of financial aid to enable students to attend the school of their choice and to ensure that no student is denied the benefits of higher education due to their family's financial circumstances.  To maximize the number of students assisted and help ensure that students from the neediest families receive the greatest amount of need-based financial aid, schools must assess each student's ability to pay, which in turn requires consideration of their family's financial circumstances.

Plaintiffs bring this suit against College Board, a non-profit organization, and 40 of its non-profit member colleges and universities (the "Schools," and with College Board, "Defendants"). College Board administers CSS Profile, a standardized financial aid application that educational institutions may opt to use to collect information about an applicant's need for financial aid. Prospective students and their families use CSS Profile to submit their relevant financial information to College Board, which then shares that information with the colleges and universities each applicant designates.  CSS Profile makes it easier for prospective students and their families to apply for financial aid from multiple schools because it offers students a standardized form accepted by more than 250 colleges, universities, and programs.

Plaintiffs allege that Defendants engaged in a price-fixing conspiracy relating to the collection of "noncustodial" parent ("NCP") financial information through CSS Profile.  But the Complaint is devoid of factual allegations suggesting that Defendants fixed prices.  Even an alleged agreement to collect and consider financial information from NCPs is implausible and refuted by the Complaint's own allegations.  For example, the Complaint admits that many schools already considered such information *before* any alleged agreement.  Compl. ¶ 70.  This is not

1

surprising because considering an NCP's financial information provides a more complete and accurate picture of a family's ability to pay for college, which in turn allows schools to allocate aid more equitably. Moreover, many College Board member schools do not require NCP financial information. *See id.* ¶¶ 76, 83 n.81. This fact demonstrates the implausibility of the allegation of an agreement made through the College Board and underscores the Complaint's failure to provide legally required factual specificity about any individual school's purported agreement to collect NCP information through CSS Profile, including when, or even if, such an agreement was reached. There are likewise no plausible factual allegations suggesting that the Schools agreed how to *use* NCP information in assessing a family's financial circumstances, let alone to coordinate in using it to lower financial aid awards and thereby increase the net price of attendance. Plaintiffs make only the implausible and impermissibly conclusory assertion that the Schools, in requiring applicants to submit NCP financial information, conspired "to fix, raise, and stabilize and reduce the amount of financial aid paid" to a putative class of current and former students. *Id.* ¶ 118. This is plainly insufficient under Supreme Court and Seventh Circuit precedent for several independent reasons.

*First*, Plaintiffs have failed plausibly to allege an agreement among the Schools. At most, Plaintiffs allege that College Board, including representatives of the Schools, offered and encouraged its members to use a service—i.e., a standardized way to more efficiently collect relevant financial information from college applicants and their families to assist in the provision of financial aid awards. Some schools chose to use that service, while others did not. Some schools that use the service are Defendants, while many are not. Plaintiffs thus fail to support any reasonable inference that the Schools that chose to collect NCP financial information through CSS Profile did so because of any agreement to collect and to use NCP information, let alone an

agreement to decrease financial aid awards to students. Plaintiffs do not state a Section 1 conspiracy claim and do not come close to alleging an agreement to "fix" financial aid. Moreover, for most Defendants, Plaintiffs rely on impermissible group pleading, making no specific factual allegations about any particular School's supposed participation in the alleged conspiracy.

*Second*, even if Plaintiffs had sufficiently alleged an agreement, they do not plead facts plausibly establishing an unreasonable restraint of trade under any of the three frameworks—*per se*, quick look, or rule of reason—that courts apply to such allegations. Regarding the *per se* and quick-look approaches, Plaintiffs never explain why a purported agreement to collect NCP financial information (or even to consider it in determining aid awards) is the type of agreement that experience has shown almost always harms competition. Plaintiffs cannot make that showing because collecting NCP financial information is undeniably pertinent to a legitimate objective: the accurate calculation and equitable distribution of need-based financial aid. Applying the rule of reason, Plaintiffs' claims fail because they posit an implausible market manufactured solely for litigation purposes, and because they do not plead direct or indirect evidence of anticompetitive effects. Those deficiencies defeat Plaintiffs' claims.

*Third*, Plaintiffs do not plausibly allege an antitrust injury or establish any basis for antitrust standing. The Complaint alleges no facts showing that either Plaintiff paid higher prices *because* of the purported agreement, especially given Plaintiffs' admission that some schools considered NCP financial information *before* the formation of any alleged agreement. And Plaintiff Hansen does not even allege that the schools he attended considered his NCP financial information, or that his NCP had income that would have resulted in a decreased aid award.

*Fourth*, Plaintiff Chang's claim is time-barred under the Sherman Act's four-year statute of limitations. Chang's alleged injuries, if any, accrued more than four years ago, making it clear

on the face of the Complaint that her claim is time-barred.  She also has pled no basis to support delayed accrual under the discovery rule or to toll the statute of limitations under any other equitable tolling doctrine.

Plaintiffs' legal theory threatens the entire ecosystem of need-based financial aid, interfering with Schools' efforts to assist those students who need it most.  *All* schools that award need-based aid consider the assets and income of applicants' families to determine the scope of financial need.  Schools naturally consider similar information and, unsurprisingly, many use the standardized CSS Profile to make it easier for students to apply for financial aid at multiple schools.  Stripped of its conclusory language, the Complaint alleges nothing more.  If such claims can proceed, every disagreement over a component of financial needs assessment could trigger an antitrust class action, in flat contradiction of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and other precedent.  Clearly established principles of antitrust law bar Plaintiffs' claims, and the Complaint should be dismissed with prejudice.

## BACKGROUND

Defendant College Board is a non-profit association founded more than 120 years ago.  The Defendant Schools include 40 non-profit institutions of higher learning that are—like hundreds of other colleges and universities—College Board members.  *See* Compl. ¶¶ 14-53.  Each year, these Schools raise and distribute billions of dollars to enable students from low- and middle-income families to afford a college education.  *See id.* ¶ 4.  While the federal government provides these families with some financial assistance—through need-based grants and loans, both subsidized and unsubsidized—this assistance often does not meet a family's full financial need.  Consequently, the Schools typically award students institutional grants and (less often) loans to address their remaining unmet need.  To maximize the number of students assisted and help ensure

4

that the neediest families receive the greatest amount of assistance, the Schools must first assess a student's financial need, which includes evaluating their family's ability to pay. Once a School calculates how much the student and their family can contribute to their education costs, the School can determine the extent to which it will meet that need through a financial aid award.

## A. CSS Profile And The Collection Of NCP Information

College Board has administered a standardized financial aid application for decades, now known as CSS Profile. While the content and format of the application have changed over time, the underlying goal remains the same: to make the financial aid process more efficient and less burdensome by allowing students and their families to fill out one financial aid application, which can be submitted at one time to any of the more than 250 College Board members that accept it. *See* Compl. ¶¶ 4, 67. To use CSS Profile, students and their families submit their relevant financial information online, which College Board sends to the schools that the students select. Each year, CSS Profile connects students to more than $10 billion in non-federal financial aid. *Id.* ¶ 4.

College Board members have long had the individual option to require submission of financial information from a student's NCP, in addition to the custodial parent. As explained in an *Inside Higher Ed* article cited throughout the Complaint, College Board added the ability to request NCP financial information to CSS Profile's online system around 2005.[1] According to the Complaint, before that point, "schools took various approaches to considering the assets of parents

---

[1]    Jaschik, *You Can't Divorce Tuition Bills*, INSIDE HIGHER ED (Oct. 31, 2005), https://www.insidehighered.com/news/2005/11/01/you-cant-divorce-tuition-bills, attached as Exhibit 1. Plaintiffs cite this article throughout the Complaint, *see* Compl. ¶¶ 70 n.73, 70 n.74, 82 n.80, and elsewhere quote it without attribution, *see id.* ¶¶ 71, 73, 74. "[I]f a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir 2012); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 992 n.10 (N.D. Ill. 2022) (applying incorporation by reference doctrine in considering motion to dismiss Sherman Act claim). Where documents incorporated by reference "contradict allegations stated in the complaint, the documents take precedence." *Preuher v. Seterus, LLC*, 2014 WL 7005095, at *1 (N.D. Ill. Dec. 11, 2014).

in making financial aid determinations[,] with numerous schools focusing on the assets of the parents who had custody of the child," while others considered both custodial and noncustodial parents' assets. *See* Compl. ¶ 70.[2] That remains true today. The list of CSS Profile participants (incorporated by reference in the Complaint) shows that for the 2025-26 admissions cycle, 177 CSS Profile institutions and programs require submission of NCP financial information through CSS Profile, and 93 do not.[3]

The goal of CSS Profile is to collect information, not to fix prices. As reported in the *Inside Higher Ed* article, the "emphasis" for this "new system for handling aid applications from the children of divorced parents" was "on gathering correct information; colleges still have leeway to make their own decisions about who should pay what, but they will be doing it based on consistent (and, the panel hopes, more accurate) information." Ex. 1 at 1. One university administrator "stress[ed that] colleges using this system to gather information are under no obligation to use it strictly to award aid. They can make adjustments as they feel appropriate, given … the specifics of the case." *Id.* at 4. Moreover, students can communicate with schools directly or submit a waiver request (though the specifics of these procedures vary from school to school) to explain why their individual circumstances weigh against consideration of their NCP financial information, as Plaintiff Chang acknowledges she did. Compl. ¶ 12.

### B. Plaintiffs And Their Claims

Plaintiff Maxwell Hansen "attended American University from the fall of 2021 through the fall of 2023 and then transferred to Boston University where he is currently a student." *Compl.*

---

[2] The Complaint contains two paragraphs numbered 70. Defendants cite the first of these paragraphs as 70, and the second as 70[A].
[3] *See 2025-2026 Participating Institutions and Programs*, COLLEGE BOARD, https://profile.collegeboard.org/profile/ppi/participatinginstitutions.aspx (cited at Compl. ¶ 83 n.81). A copy of this website is attached as Exhibit 2.

¶ 11.   Hansen alleges that "[b]efore applying to colleges" he was "required to submit a CSS Profile," and both his custodial and noncustodial parents were required to provide their financial information.  *Id.*  Hansen also alleges that he "received about $15,000/year in financial aid from American University and about $20,000/year in financial aid from Boston University."  *Id.*  Hansen does not allege what income (if any) his NCP reported.  He does not allege any facts plausibly suggesting that he would have received a larger aid award if American or Boston University had not collected financial information from his NCP.  He does not allege that he asked either American or Boston University not to consider his NCP financial information.  And he does not allege that American or Boston University required submission of NCP financial information because of any agreement with each other or any other School, rather than independent determinations.

Plaintiff Eileen Chang "attended Cornell University from 2017 to 2021."  Compl. ¶ 12. She also alleges that "[b]efore applying to colleges" she submitted a CSS Profile and that both her custodial and noncustodial parents were required to provide their financial information.  *Id.* Without providing any details, Chang contends that her noncustodial parent had "a much higher income than her custodial parent" but was "unable to contribute" to the cost of her education.  *Id.* Chang admits that she received financial aid from Cornell; notably she does not specify how much. *Id.*  Chang does not allege that she personally paid anything to attend Cornell, instead admitting that her custodial parent paid her education costs not covered by financial aid.  *Id.*  Nor does Chang allege that Cornell required submission of NCP financial information because of any alleged agreement with any other School.

Despite citing public information throughout their Complaint from as early as 2006, both Hansen and Chang claim that "[u]ntil recent weeks," they "did not know that Defendants had

entered into the conspiracy alleged in this Complaint or that the conspiracy caused [them] to suffer financial harm." Compl. ¶¶ 11, 12. Neither explains what happened "in recent weeks" that supposedly alerted them to the purported conspiracy or to any specific financial harm allegedly caused by that conspiracy.

Plaintiffs filed this putative class action in October 2024, alleging a violation of Section 1 of the Sherman Act. Compl. ¶¶ 13-53, 118. Plaintiffs purportedly chose to sue the Schools because they allegedly require submission of NCP financial information and are within the "50 highest ranked private national universities according to *U.S. News & World Report* rankings averaged from 2008 through 2023." *Id.* ¶ 88. While Plaintiffs claim that Defendants entered into a "conspiracy in restraint of trade artificially to fix, raise, and stabilize and reduce the amount of financial aid," *id.* ¶ 118, they allege no facts showing that these Defendants agreed to *anything* among themselves. They allege no facts showing that the Schools agreed to require submission of NCP financial information, or when such an agreement occurred. They allege no facts showing that the Schools agreed to consider NCP financial information, much less that they agreed to consider it in a common way. And they allege no facts showing that the Schools agreed to "fix" the amount of financial aid offered to students with NCPs through a common methodology or otherwise. Instead, Plaintiffs allege only that "in or around 2006," some 75 schools began requiring applicants to submit financial information for their NCPs through College Board's new online system, but they identify only five Defendant Schools that allegedly fall within that category. *See id.* ¶¶ 73, 74.

## ARGUMENT

Section 1 of the Sherman Act bans agreements that unreasonably restrain trade. *See* 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must plead facts plausibly suggesting: "(1)

a contract, combination, or conspiracy (meaning, an agreement); (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (cleaned up). Plaintiffs' Complaint does not satisfy any of these elements and should be dismissed.

## I.      Plaintiffs Have Not Plausibly Alleged Any Agreement

For any Section 1 case, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal citations omitted). To survive a motion to dismiss, plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made . . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. This fundamental pleading requirement is both general and specific— plaintiffs must offer plausible factual allegations that the anticompetitive agreement exists, and that each defendant played a role in it. *See id.*; *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

Plaintiffs fail on both counts. They have not alleged facts showing the Schools "participated in any type of agreement" among themselves, "let alone one that fixes prices." *See Slep-Tone Entm't Corp. v. Elwood Enters., Inc.*, 165 F. Supp. 3d 705, 713 (N.D. Ill. 2015). Moreover, the Complaint fails to allege facts showing that any School participated in Plaintiffs' purported agreement. Plaintiffs rely instead on undifferentiated and improper group pleading and guilt-by-association theories, which the Seventh Circuit has held are insufficient as a matter of law to satisfy notice pleading requirements under Rule 8. *See Knight*, 725 F.3d at 818 ("A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy.").

To adequately plead their claims, Plaintiffs must allege either (1) direct evidence of an unlawful agreement, or alternatively, (2) circumstantial evidence of an agreement based on parallel conduct as well as "certain 'plus factors[,]' which 'are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.'" *Greco v. Mallouk*, 2024 WL 4119169, at *6 (N.D. Ill. Sept. 9, 2024). Plaintiffs allege no facts that plausibly support an unlawful agreement under either approach.

Direct evidence is rare and "tantamount to an acknowledgment of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). It is a "smoking gun," "usually tak[ing] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). Plaintiffs do not even try to allege direct evidence under that standard. Without direct evidence, Plaintiffs must rely on the "indirect" route, which requires plausible factual allegations of both (1) parallel conduct and (2) "plus factors" suggesting an agreement. *Greco*, 2024 WL 4119169, at *6. Plaintiffs fail to satisfy these requirements.

### A.   Plaintiffs Have Not Plausibly Alleged Any Agreement To Require Submission of NCP Financial Information

Plaintiffs claim that Defendants agreed to adopt a so-called "NCP Agreed Pricing Strategy," which they define in part as "concerted action to require a noncustodial parent of any applicant seeking non-federal financial aid to provide financial information." Compl. ¶ 2. At the outset, Plaintiffs improperly attempt to conflate common *collection* of factual information with a "pricing" agreement. Yet Plaintiffs have not even adequately pled an agreement to collect information.

10

Plaintiffs do not plausibly allege that the Schools acted in parallel to collect NCP financial information through College Board. Plaintiffs' theory relies primarily on the assertion that the Schools currently require submission of NCP financial information, and that many of them adopted that requirement around the same time. But the *facts* that Plaintiffs allege say no such thing. The Complaint asserts that College Board developed a new online system for collecting NCP financial information, that it made the system available to Schools in or around 2006, and that "[a]t least 75 schools immediately adopted" it. Compl. ¶¶ 70, 73. But Plaintiffs name only seven schools purportedly among the "[a]t least 75 schools" that "immediately adopted" the new system, two of which are not even Defendants. *Id.* ¶¶ 73, 74. Plaintiffs also acknowledge that at least some schools *already* required submission of NCP financial information before 2006, which shows they had independent reasons for doing so. *Id.* ¶ 70. Plaintiffs thus have not even alleged that all the Schools changed their behavior at or around the same time.

Some Schools' decision to begin requiring the submission of NCP financial information in 2006 more plausibly suggests "independent responses to common stimuli," not an illegal agreement. *See Twombly*, 550 U.S. at 556 n.4. The *Inside Higher Ed* article cited throughout the Complaint explains that, around 2006, College Board created an easy-to-use mechanism for its member schools to collect NCP financial information through the online CSS Profile system—a process that made it much easier for students and families to provide, and for schools to collect, NCP financial information. That some schools decided to use this new, easy-to-use system when it was launched provides no basis to claim that the Schools agreed with one another to do so—just as, for example, the mere fact that a number of businesses all chose to use the same new computer operating system would not suggest any agreement among those businesses to do so.

Plaintiffs also cannot rely on the Schools' College Board membership to support the allegation that they reached any sort of agreement among themselves. This is especially true because the vast majority of College Board members are not even alleged to be part of the conspiracy. "Absent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle" at the motion to dismiss stage. *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) (same).

Given the context, the Schools' mere status as College Board members is not indicative of a conspiracy. The College Board website cited by Plaintiffs, Compl. ¶ 83 n.81, shows that, to this day, many College Board members that use CSS Profile do not require submission of NCP financial information. *See* Ex. 2 (while 177 CSS Profile institutions and programs require submission, 93 do not); Compl. ¶ 76 (quoting College Board website statement that "[*s*]ome colleges *may* require the CSS Profile from both the custodial and noncustodial parent" (emphasis added)). Plaintiffs have also alleged no facts to suggest that an arbitrary subset of College Board members—an organization that has existed for over 120 years and has thousands of members— suddenly began colluding in 2006. Indeed, given that many CSS Profile schools *do not* require submission of NCP financial information, the allegations only support the conclusion that College Board offered a service to all its members and each independently chose whether or not to use it. That is not an actionable (or any other kind of) agreement under the antitrust laws. *See Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 343 (7th Cir. 2022).

Plaintiffs' conclusory allegation that College Board encouraged its members to "follow the NCP Agreed Pricing Strategy," Compl. ¶ 72, gets them no further. First, encouraging members to

use CSS Profile to collect NCP information is insufficient to plausibly plead an agreement between a School and the College Board to collect NCP information. Second, whether or not there were any vertical agreements between College Board and individual Schools, Plaintiffs do not plausibly allege any horizontal agreement among the individual Schools to collect NCP financial information, which is necessary to support the conspiracy claim they have pled. *See, e.g.*, *In re EpiPen Direct Purchaser Litig.*, 2022 WL 1017770, at *7 (D. Minn. Apr. 5, 2022) (collecting cases).

It makes perfect sense that, when evaluating a student's financial circumstances, a school would independently decide to collect information from both parents, regardless of which parent has primary physical custody of the child, and then make a decision about how much weight, if any, to give to that information. The Seventh Circuit has made clear that "courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest." *Marion Diagnostic Ctr.*, 29 F.4th at 351; *accord In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).

A simple example illustrates the point. Assume that two parents are divorced. Parent A makes $2 million dollars a year and has substantial assets, while parent B earns $20,000 a year and has minimal assets. Also assume that the parents' divorce agreement awards joint custody, requires parent A to pay for the child's education through college, but provides that the child lives four days each week with parent B. In that case, as pled in the Complaint, parent B would be the "custodial" parent. Failing to consider "noncustodial" parent A's assets means that the school would likely view the child as a strong candidate for need-based financial aid, maybe even financial aid covering full tuition. In reality, that child's family can afford to pay the full cost of

13

attendance—and, indeed, parent A has contractually agreed to do so.  Collecting a full financial picture discourages any attempt to game the system and structure agreements to avoid disclosure of NCP income and assets.  These situations illustrate why it is rational for a School to make an independent decision to collect and consider NCP financial information when distributing need-based financial aid.  Nothing in the Complaint even remotely supports the implausible suggestion that the Schools instead have chosen to do so because of an alleged agreement—one as to which the Complaint provides no details.

### B. Plaintiffs Have Not Plausibly Alleged An Agreement To Use NCP Financial Information, Let Alone Use It In A Standardized Way, To Fix Prices

Plaintiffs also do not allege facts supporting their claim that all Defendants conspired to "fix[], increas[e], and stabiliz[e] the amount of financial aid they offered," including by "agreeing upon a common method for the consideration of noncustodial parent assets."  Compl. ¶ 119.  Even assuming Plaintiffs somehow plausibly alleged an agreement *to collect* NCP financial information, they have alleged no facts suggesting a further agreement *to use* NCP financial information, let alone to use any common methodology to analyze NCP financial information when calculating a family's ability to pay.  In other words, while the Complaint repeatedly uses the shorthand "NCP Agreed Pricing Strategy," that is misleading.  The Complaint defines that term based on *collection* of NCP financial information, *id.* ¶ 2, while never providing any factual allegations of an agreement to use the information collected, much less to do so in any coordinated way to fix the amount of financial aid offered to students with NCPs.  Plaintiffs make the conclusory assertion that "[t]he Institutional Methodology is used by schools that require students to submit a CSS Profile," *id.* ¶ 67, but they admit that under the Institutional Methodology, different "formulas are . . . used to generate financial aid offers," *id.* ¶ 71.

14

The 2005 *Inside Higher Ed* article cited throughout the Complaint, *see supra* n.1, further refutes Plaintiffs' allegations that there was an agreement among the Schools to consider NCP financial information in a standardized way. As that article explains, "[t]he emphasis of the system is on gathering correct information; *colleges still have leeway to make their own decisions about who should pay what*, but they will be doing it based on consistent (and, the panel hopes, more accurate) information." Ex. 1 at 1 (emphasis added). This is also reiterated in the CSS/Financial Aid PROFILE User's Guide, a document from College Board explaining to CSS Profile schools how the system works, which Plaintiffs quote without attribution at Paragraph 75 of their Complaint. Ex. 3. Plaintiffs cite four bullets from that document but conspicuously leave out a fifth: "Final decisions on the requirement for and use of noncustodial data must be *determined by institutional policy and procedure*." Ex. 3 at 1 (emphasis in original).[4] That is to say, each school makes a unilateral decision about whether and how to consider NCP data in awarding financial aid. *See Marion Diagnostic Ctr.*, 29 F.4th at 343.

### C. No Plus Factors Exist To Support Plaintiffs' Claims

Because Plaintiffs have failed plausibly to allege the type of parallel conduct that suggests an agreement existed with respect to consideration of NCP data, much less the awarding of financial aid, *see supra* Sections I.A, I.B, there is no need to consider whether any "plus factors" "push the alleged conspiracy across the line separating the possible from the plausible." *Washington Cnty.*, 328 F. Supp. 3d at 831; *accord, Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017). Plaintiffs have also failed to present any facts suggesting

---

[4] For the same reasons discussed above (at n.1), the CSS/Financial Aid PROFILE User's Guide can also be considered as incorporated by reference into the Complaint.

15

an agreement through "plus factors" that are "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Greco*, 2024 WL 4119169, at *6.

Plus factors may include "evidence of other circumstances giving rise to a less direct inference of conspiracy, such as 'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9 (N.D. Ill. Nov. 6, 2020) (quoting *Anderson News LLC v. American Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018)). The Complaint is devoid of allegations addressing these or other plus factors. Most notably, Plaintiffs make no allegation that collecting NCP financial information is against the Schools' independent self-interest.

Further, as discussed, the Schools' mere membership in College Board, with nothing more, is insufficient to suggest collusive activity. *See Washington Cnty.*, 328 F. Supp. 3d at 843. And Plaintiffs have not alleged that the Schools attended any particular meetings, discussed any particular topics, or reached any agreements through those meetings. In addition, there is no alleged "industry structure, [or] industry practice[] that facilitates collusion" among the Schools. *In re Text Message Antitrust Litig.*, 630 F.3d at 627-28. The large size of Plaintiffs' proposed market (50 colleges and universities); the individualized nature of financial aid calculations (where every student gets a different "price"); each School's lack of visibility into other Schools' financial aid awards (Plaintiffs do not allege that any School knows what "price" other Schools are offering a particular student); and the obvious policy reasons why schools could and sometimes did choose to consider NCP financial information even prior to the alleged agreement, all make it highly implausible that the Schools colluded to fix prices or even to collect data. *Cf. id.* at 628 (finding industry structure conducive to collusion where market was highly concentrated among four

16

participants and "it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating'"); *see also Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 937 (7th Cir. 2018) ("continuation of a historic pattern . . . does not plausibly allow one to infer the existence of a cartel").

### D.   Plaintiffs Have Not Plausibly Alleged Any Defendant's Specific Participation In The Purported Agreement

Plaintiffs' conspiracy claim also fails because they do not allege facts plausibly demonstrating that any particular Defendant participated in the alleged conspiracy. The Seventh Circuit has explained that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful," and "[a] complaint based on a theory of collective responsibility must be dismissed." *Knight*, 725 F.3d at 818. Even in a case (unlike here) where plaintiffs plausibly allege a conspiracy, "it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." *Id.* "[W]hile the complaint need not contain detailed 'defendant by defendant' allegations, it must allege that each individual defendant joined the conspiracy and played some role in it because . . . the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *United States Bd. of Oral Implantology v. American Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 904-05 (N.D. Ill. 2019).

Rather than alleging facts plausibly suggesting that any School reached an agreement with any other School, Plaintiffs fall back on their conclusory "Pricing Strategy" allegations, asserting that "[c]urrently, all University Defendants have committed to the NCP Agreed Pricing Strategy." Compl. ¶ 4. Such "'group pleading'—where a plaintiff's allegations lump defendants together without describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct—is insufficient at the motion-to-dismiss stage." *MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, 2019 WL 11658793, at *1 n.4 (N.D. Ill.

17

Jan. 25, 2019). This is particularly true here, where Plaintiffs acknowledge that some Schools already collected NCP financial information even before the alleged "NCP Agreed Pricing Strategy" in 2006. Compl. ¶ 70. Because Plaintiffs "furnish[] no clue[s] as to which" Schools "supposedly agreed, or when and where the illicit agreement took place," *Twombly*, 550 U.S. at 565 n.10, their Complaint does not comply with the Seventh Circuit's pleading standard and does not state a claim against any Defendant*, see Knight*, 725 F.3d at 818.

The minimal Defendant-specific allegations Plaintiffs do include fail to show that any Defendant entered into an unlawful agreement. Plaintiffs primarily identify when each School became a College Board member—ranging from 1900 to 1961—and simply note that each School's website currently "links to the CSS Profile website and requires that applicants with a noncustodial parent must comply with the NCP requirements of the CSS Profile." Compl. ¶¶ 14-53. Plaintiffs also allege that a handful of Schools have staff members who currently serve on various College Board committees, *id.* ¶¶ 17, 23, 26, 29, 32, 34, 40, 43, 51, but Plaintiffs do not even try to explain why that would be relevant to whether those Schools reached any sort of agreement among themselves, or when that supposed agreement may have been reached, let alone whether and when they reached an agreement with all the other Schools for whom there are no allegations of participating on a College Board committee.

Nor does the allegation that Defendants Dartmouth, Cornell, Fordham, Georgetown, and Harvard (along with non-Defendants Colgate and the University of Chicago) "immediately adopted the new NCP methodology in 2006," Compl. ¶ 74, help Plaintiffs' claims even with respect to those schools, much less the claims against the other 35 Schools. Those facts are taken, without attribution, from the referenced *Inside Higher Ed* article, which says merely that those schools were "[a]mong those using the [new College Board] system now." Ex. 1 at 1. The article

18

does not say that those schools had agreed to collect or use NCP data—let alone use that data in a standardized way.  Nor does it say that those schools had not already been collecting or using NCP data before 2006.

## II.    Plaintiffs Have Not Plausibly Alleged Anticompetitive Conduct

Even if Plaintiffs satisfied the concerted action element for their claim, they must also plead facts plausibly alleging the challenged agreement was *anticompetitive*.  That question is governed by the rule of reason, not the *per se* rule or quick-look standard.  And Plaintiffs fail to plead a rule-of-reason claim because they have alleged neither a plausible relevant market nor anticompetitive effects.

### A.    Plaintiffs Do Not Allege A Plausible *Per Se* Or Quick-Look Claim

The Complaint asserts that the Court should condemn Defendants' alleged agreement under the *per se* rule or, in the alternative, under the so-called "quick-look" standard.  *See* Compl. ¶¶ 6, 87, 122.  However, the *per se* rule applies only to a small universe of "manifestly anticompetitive" restraints that "always or almost always tend to restrict competition and decrease output" and "lack any redeeming virtue."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted and alteration incorporated).  Courts "presumptively appl[y] rule of reason analysis" and are "reluctan[t] to adopt *per se* rules where the economic impact of certain practices is not immediately obvious."  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (citation omitted and alteration incorporated); *see also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012) (*per se* treatment is limited to "cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever").  Courts are particularly hesitant to apply *per se* treatment in cases involving non-profit institutions of higher education, where the economic incentives and objectives depart sharply

19

from those in traditional industries. *See United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993).

Plaintiffs' claims do not warrant application of the *per se* standard. Settled precedent forecloses Plaintiffs' attempt to manufacture *per se* treatment through a conclusory allegation that "Defendants' conduct is *per se* anticompetitive because it constitutes an agreement between horizontal competitors related to price," Compl. ¶¶ 6, 87. *See, e.g.*, *Association of Am. Physicians & Surgeons, Inc. v. American Bd. of Med. Specialties*, 2017 WL 6821094, at *4 (N.D. Ill. Dec. 13, 2017) (rejecting "conclusory" *per se* allegations); *see also Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983) ("The mere attachment of a *per se* label by a plaintiff to defendants' conduct does not automatically invoke the *per se* doctrine."); *North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 751 (N.D. Ill. 2005) (the mere application of "pejorative labels" does not suffice to trigger *per se* treatment); *cf. Choh v. Brown Univ.*, -- F. Supp. 3d --, 2024 WL 4465476, at *5-7 (D. Conn. Oct. 10, 2024) (declining to apply *per se* rule in case challenging Ivy League financial aid practices even though plaintiffs alleged that "'[t]he University Defendants are horizontal competitors in the commercial activities in the Relevant Service Markets'" (citation omitted)).

The Complaint's vague assertion that the *per se* rule applies because it purports to allege an agreement "related to price" also runs contrary to well-settled law. An alleged agreement is not price fixing subject to *per se* treatment just because it may have some tangential relationship to price. *See, e.g.*, *UNR Indus., Inc. v. Continental Ins. Co.*, 607 F. Supp. 855, 859-60 (N.D. Ill. 1984) ("The price-fixing label can by analogy attach to conduct more subtle than a simple conspiracy to directly fix prices, but the analogy is successful only if the challenged conduct is, like traditional price-fixing, virtually certain to reduce competition." (citations omitted)). Courts reserve *per se*

treatment for only the types of practices that experience teaches are virtually always anticompetitive, like naked horizontal price fixing, allocating markets, or restricting output. *See, e.g.*, *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 864 (N.D. Ill. 2010). Plaintiffs have alleged nothing of the sort here—especially since consideration of NCP financial information *could decrease* at least some students' net price depending on their family situation and the alternative financial information their schools otherwise would have considered, *see infra* at pp.33-34.

Moreover, Plaintiffs' allegations that the Schools agreed to *collect* NCP financial information does not, and cannot, adequately allege a restraint on competition at all, much less one that would always (or ever) be anticompetitive. *See Leegin*, 551 U.S. at 877-78 ("A *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if they can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason." (citations omitted)). To the contrary, collecting NCP financial information through a centralized source has *procompetitive* virtues, including the commonsense utility of enabling students to apply efficiently for financial aid at multiple schools through submission of a single set of information, and helping ensure that schools have complete and accurate information that enables them to identify the neediest students and maximize the number of students assisted. This "possibility of procompetitive effects precludes *per se* treatment." *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d at 876 n.26.

Finally, these procompetitive and efficiency-enhancing virtues likewise make this case a poor fit for the quick-look approach. That approach is appropriate only where the challenged conduct has a purely "anticompetitive character" but there are "nonetheless reasons to examine potential procompetitive justifications." *See Agnew*, 683 F.3d at 336 (citation omitted). Notably,

the court in *United States v. Brown University* rejected use of the quick-look approach in the context of higher education financial aid and noted that the district court "fail[ed] to adequately consider the procompetitive and social welfare justifications" for the financial aid practices at issue in that case. 5 F.3d at 661. The same reasoning applies here, and the correct lens through which to assess Plaintiffs' claim is the rule of reason. *See, e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 836-42 (N.D. Ill. 2020).

### B.    Plaintiffs Fail To Plead A Plausible Rule Of Reason Claim

To proceed under the rule of reason, Plaintiffs must "plausibly allege that [the challenged] agreement[] had a substantial anticompetitive effect." *Vital Pharm., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 788 (N.D. Ill. 2022). "A plaintiff can make this showing directly through proof of actual detrimental effects on competition or indirectly by proof of market power plus some evidence that the challenged restraint harms competition." *Id*. at 787 (cleaned up). Plaintiffs fail on both counts.

### 1.    Plaintiffs Fail To Plead Direct Evidence Of Anticompetitive Harm

Plaintiffs do not adequately plead that the alleged agreement caused any "actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. American Express Co*., 585 U.S. 529, 542 (2018) (cleaned up). When a plaintiff "advances an antitrust claim based on direct evidence in the form of increased prices, the question is whether it can show an actual anticompetitive change in prices after the restraint was implemented." *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021); *see also Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 557 (7th Cir. 1980) ("The . . . test of anticompetitive effects . . . consider[s] the facts peculiar to the business . . . [and] its condition before and after the restraint was imposed[.]"). Plaintiffs' Complaint points to two supposed effects. *First*, that the use of NCP financial information in a hypothetical scenario would make

22

"the out-of-pocket cost . . . much higher . . . solely because of the noncustodial parent rules." Compl. ¶ 84. But such an unsupported statement of speculative harm falls short of meeting Plaintiffs' "burden of demonstrating damage to competition with specific factual allegations" at the pleading stage. *See Jacobs v. Tempur Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir. 2012) ("[A] section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably . . . . Rather, a claimant must, at a minimum, sketch the outline of the injury to competition with allegations of supporting factual detail." (cleaned up)). *Second*, Plaintiffs allege that "[t]he average net price for the forty Defendant universities who use the NCP Agreed Pricing Strategy is approximately $6,200 more than for the ten non-NCP universities in the top 50 private universities." Compl. ¶ 5. The delta between the "average net price for the forty Defendant universities" and the "ten non-NCP universities," Plaintiffs say, is "indicative of the anticompetitive effects from Defendants' concerted activity." *Id.* That allegation does not plausibly indicate actual detrimental effects on competition.

To begin, Plaintiffs do not explain how the consideration of NCP financial information caused an increase in the "average net price." As in all Section 1 cases, Plaintiffs must "allege a plausible causal relationship between the [allegedly unlawful conduct] and the alleged changes in pricing and output." *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at *7 (N.D. Ill. Oct. 19, 2020). Here, the Complaint does not identify any change in pricing or output over the relevant period, or before and during the relevant period. And it fails to allege facts plausibly connecting the allegedly higher "average net price" for the Schools to their consideration of NCP financial information: including when the price difference compared to the ten other schools emerged; would comparing any ten-school subgroup with the other Schools result

23

in a similar price difference; did this price difference coincide with the adoption of the so-called NCP requirement; and if not, why is it plausible to assume a causal connection between the NCP financial information and the price difference?[5]

Moreover, Plaintiffs selected a metric—average net price—that does not and cannot support the argument they wish to make: that schools that require submission of NCP financial information charge higher net prices than schools that do not, and more than they otherwise would in a "competitive" market. The court in *In re Processed Egg Products Antitrust Litigation*, 821 F. Supp. 2d 709 (E.D. Pa. 2011), confronted a similar situation. There, the plaintiffs alleged that the defendants conspired to restrict the supply of domestic eggs, in part by selling eggs at a loss in export markets. *Id.* at 712, 737. The plaintiffs pointed to pricing data showing that average egg prices in domestic markets exceeded export prices in certain time periods. *Id.* at 737. The court rejected this "broad conclusion," pointing out that "'average' necessarily implies that some domestic egg prices were lower than the average domestic price (just as some could be higher)," an unremarkable outcome that did not render the plaintiffs' loss-making sales theory plausible. *Id.* at 738.

Plaintiffs' average net price allegations are similarly unavailing. It is possible, even probable, that many of the Schools requiring submission of NCP financial information charge a *lower* net price than some of the ten non-NCP schools Plaintiffs feature in the Complaint. *See* Compl. ¶ 88 n.85; *Processed Eggs*, 821 F. Supp. 2d at 738. Plaintiffs' chosen metric—an average net price for *all* students at *all* NCP schools and *all* non-NCP schools in their alleged market— elides that issue and says nothing about any given School's actual net prices for students who

---

[5] Plaintiffs' average net price metric encompasses the net cost of attendance for *all* students, not just those with a noncustodial parent. Compl. ¶ 5. Plaintiffs never explain how the "NCP Agreed Pricing Strategy" would have driven up average net prices for all students, or why that metric says *anything* about the effects of a policy that allegedly impacted only the subset of students with a noncustodial parent.

submit NCP financial information. *See* Kaye & Freedman, REFERENCE GUIDE ON STATISTICS, IN REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 211, 239 (Fed. Judicial Ctr., 3d ed. 2011) ("The location of the center of a batch of numbers reveals nothing about the variation exhibited by these numbers."). It is simply implausible to assume that the delta represents an anticompetitive effect if some NCP schools charge a higher net price than the non-NCP schools, and other NCP schools charge a lower net price. As in *Processed Eggs*, Plaintiffs sidestep the problem by improperly averaging it away.

### 2. Plaintiffs Fail To Plead Indirect Evidence Of Anticompetitive Harm Because The Alleged Relevant Market Is Implausible

Plaintiffs' Complaint also fails because they do not plausibly plead a relevant market. Without a plausible relevant market, "there is no way to measure" whether Defendants have sufficient power to harm competition or that competition was harmed. *American Express Co.*, 585 U.S. at 543; *see also Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 953 (N.D. Ill. 2019) ("Without a cognizable market, neither the reasonableness of the restraint nor the defendants' market power can be assessed."). Indeed, even if Plaintiffs had alleged direct, measurable anticompetitive effects, they would still be required to plead "the rough contours of a relevant market." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). Plaintiffs have not done so.

Courts do not "blindly accept a market definition proposed in a complaint." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013). Instead, complaints should be dismissed if they do not allege facts showing that the proposed market includes *all* products consumers would view as reasonably interchangeable—and therefore competing—substitutes. *See, e.g., Ducere LLC v. Enbridge (U.S.) Inc.*, 2025 WL 81373, at *4 (N.D. Ill. Jan. 13, 2025) (dismissing complaint that alleged no facts showing certain transportation

25

services were not reasonably interchangeable with similar services outside alleged market); *Association of Am. Physicians & Surgeons, Inc. v. American Bd. of Med. Specialties*, 2020 WL 5642941, at *7 (N.D. Ill. Sept. 22, 2020) (dismissing complaint that did "not allege facts that plausibly suggest that consumers distinguish between physicians" inside and outside the alleged market), *aff'd*, 15 F.4th 831 (7th Cir. 2021). "[C]ourts should dismiss a claim when the alleged relevant market clearly does not encompass all interchangeable products or when a plaintiff fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *International Equip. Trading, Ltd.*, 2013 WL 4599903, at *3 (citation and quotation marks omitted).

Plaintiffs define their proposed market as "the 50 highest ranked private national universities according to *U.S. News & World Report* ["USNWR"] rankings averaged from 2008 through 2023." Compl. ¶ 88. Plaintiffs' proposed market is implausible because Plaintiffs do not allege facts showing that schools within their artificially constructed market are not reasonably interchangeable with schools excluded from the alleged market, such as public universities and liberal arts colleges.

There is no USNWR ranking of "private national universities." USNWR ranks both private *and public* universities together.[6] Indeed, almost half of the top 50 schools in the current USNWR national university rankings are public.[7] And the *fiftieth* top-ranked private university currently is tied for *ninety-first* place overall, with *more than forty* public universities ranked

---

[6] *See Best National University Rankings*, U.S. NEWS & WORLD REPORT, https://www.usnews.com/best-colleges/rankings/national-universities?_sort=rank&_sortDirection=asc. The Complaint also relies on Carnegie Classifications, Compl. ¶ 90, but that ranking also groups public and private universities together. https://carnegieclassifications.acenet.edu/institutions/?inst=&basic2021__du%5B%5D=15. The Court may consider the USNWR rankings and Carnegie Classifications on the motion to dismiss because Plaintiffs rely on them in the Complaint at ¶¶ 88, 90.

[7] *See supra* n.6.

higher.[8] Plaintiffs allege no facts plausibly suggesting that a private university ranked ninety-first in the USNWR rankings does not have to compete for students against the forty-plus higher-ranked public universities with "national rankings and selectivity comparable to elite, private institutions." Compl. ¶ 95.

Plaintiffs also exclude liberal arts colleges from their putative market. Thus, if Plaintiffs' proposed market definition were credited, a prospective student considering top universities like Brown or Dartmouth would view as close competitive substitutes *all* the schools within the proposed relevant market—including Fordham, SMU, and Baylor, schools tied for ninety-first in the USNWR rankings—but *none* of the schools outside the alleged market, including "the most highly rated private liberal arts colleges—Williams, Amherst and Swarthmore," Compl. ¶ 94—or highly ranked public universities like Michigan, Virginia, and Berkeley. Plaintiffs allege no facts suggesting that is plausible. "In considering a motion to dismiss, the court is not required to don blinders and to ignore commercial reality." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F. 2d 1101, 1110 (7th Cir. 1984).

Plaintiffs' own allegations show the implausibility of their proposed market. Plaintiffs point to a document from Northwestern stating that the school sought "to remain competitive against top COFHE universities." Compl. ¶ 98. As Plaintiffs acknowledge, COFHE is a group of "highly selective private *liberal arts colleges* and universities." *Id.* (emphasis added). Plaintiffs also cite a 2001 Duke University Plan, *id.* ¶ 96, which states that the set of schools viewed as "nationally and internationally pre-eminent" includes "great state universities" and "liberal arts colleges"—neither of which is included in Plaintiffs' alleged market.[9]

---

[8] *See supra* n.6.
[9] *See Building on Excellence: The University Plan*, DUKE UNIV. 5 (Feb. 23, 2001), https://alumni.duke.edu/magazine/articles/dukes-signature-american-higher-education (quoted at Compl. ¶ 96).

Plaintiffs attempt to rationalize the exclusion of public universities by asserting that *some* public universities prioritize in-state students for admission or financial aid. Compl. ¶ 95. Even if true, Plaintiffs' allegations would only mean that public universities are particularly attractive options for in-state students. And in any event, Plaintiffs allege no facts suggesting that students do not view highly ranked public and private universities as reasonably interchangeable. Plaintiffs' conclusory speculation and self-serving line drawing do not make their alleged market plausible. *Cf. Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1012 (N.D. Ill. 2017) (complaint "offer[ed] no plausible justification for narrowing the market in [a] particular way" because the allegations "leave the matter to speculation, which they cannot do").

Plaintiffs try to justify excluding liberal arts colleges by alleging they offer "a smaller student body, smaller and less competitive athletic programs, fewer graduate programs, and less or no emphasis on research." Compl. ¶ 90. The fact that there is some variation across private universities and liberal arts colleges does not mean those schools do not compete with each other for talented undergraduates.[10] Schools need not be perfect substitutes to be in the same market: "[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there might be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437, 441 (3d Cir. 1997) (affirming dismissal of complaint) (citation omitted).[11]

---

[10] And of course, it is common sense that there also is wide variation across the fifty private universities *within* the alleged relevant market.

[11] Plaintiffs also assert that liberal arts colleges are less selective, alleging that the "top 10" private national universities have lower admission rates than the top liberal arts schools. Compl. ¶¶ 93-94. But the USNWR ranking they rely on, *id.* ¶ 90 n.86, lists acceptance rates for private universities, liberal arts colleges, and public universities *together* in one ranking of the "most selective" colleges and universities. And according to that ranking, there is wide variation in acceptance rates among schools within the proposed market. Many liberal arts colleges have *lower* admission rates than many Schools. *See* https://www.usnews.com/best-colleges/rankings/lowest-acceptance-rate.

Courts routinely dismiss complaints where, like here, the allegations demonstrate the implausibility of the relevant market. For example, in *Choh v. Brown University*, plaintiffs challenged an Ivy League policy prohibiting athletic scholarships for student athletes. 2024 WL 4465476, at *9-10. Those plaintiffs alleged that the relevant market—for the provision of educational services to "athletically and academically high-achieving students" who want to play Division I college sports while attending an academically rigorous school—was limited to the eight Ivy League schools. *Id*. at *3. But the complaint acknowledged that schools outside the Ivy League also offered Division I athletics and rigorous academic programs. *Id*. at *9. As a result, the court found the alleged market implausible and dismissed the complaint. *Id*. at *9-10.

*Henry v. Brown University*, 621 F. Supp. 3d 878 (N.D. Ill. 2022), which denied a motion to dismiss, does not counsel otherwise. That case alleged a different relevant market consisting of "private national universities with an average ranking of 25 or higher in the U.S. News & World Report rankings from 2003 through 2021." *Id*. at 889. The court found it plausible that consistently higher-ranked schools in the top 25 were in a separate market from consistently lower-ranked schools. *Id*. at 890. The alleged market in this case contains twice as many schools, with a much wider range of overall rankings. Indeed, whereas the top 25 "national universities" in the USNWR ranking are almost entirely private universities, there are more than 40 public universities ranked ahead of the fiftieth-ranked private school. No plausible facts suggest that a student considering a highly ranked private university would view a much lower-ranked private university as a reasonable substitute, but not one of the over 40 highly ranked public universities or a highly ranked liberal arts college.

Plaintiffs' failure to plead a plausible market is fatal, and the Complaint should be dismissed. *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020).

## III. Plaintiffs Fail To Plausibly Allege Antitrust Injury And Antitrust Standing

Plaintiffs' claim should also be dismissed for the independent reason that they lack facts sufficient to demonstrate antitrust injury and antitrust standing. *See, e.g.*, *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006). The related doctrines of antitrust injury and standing require pleading an injury that (1) would not have occurred but for the challenged conduct, and (2) is of the type that flows from that which makes the conduct unlawful under the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Humira*, 465 F. Supp. 3d at 843 (citing *Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993)). Additionally, "[d]ismissal is appropriate" if the antitrust injury alleged is implausible and rests "on some abstract conception or speculative measure of harm.'" *Humira*, 465 F. Supp. 3d at 843 (quoting *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 543 (1983)); *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 485 (7th Cir. 2002) (no antitrust standing where "the exact nature of the damages [plaintiffs] have suffered is speculative"). Plaintiffs' conclusory and speculative allegations that they received artificially reduced financial aid awards because of the Schools' alleged agreement to require NCP data do not satisfy these requirements.

*First*, Chang has not suffered an injury in fact. Chang admits that her custodial parent paid her tuition costs that were not covered by financial aid. Compl. ¶ 12. She does not allege that she personally paid anything to attend Cornell. And "[a] plaintiff has no constitutional injury-in-fact that would allow her to complain in federal court when her 'injury' consists solely of a financial liability that has been paid for in full by a third party (such as an insurance company), absent a

showing of some residual or collateral harm to the plaintiff." *Hull v. Burwell*, 66 F. Supp. 3d 278, 281 (D. Conn. 2014); *see also, e.g.*, *Prosser v. Becerra*, 2 F.4th 708, 714 (7th Cir. 2021) (finding no injury in fact where plaintiff received the claimed service "at no cost to herself"); *Patel v. University of Vermont*, 2021 WL 4523683, at *3 (D. Vt. Oct. 1, 2021) ("A student seeking the return of tuition which he or she has not paid may be described as someone who has suffered no injury since one cannot lose what one never had in the first place.").[12]

*Second*, Hansen does not allege that American or Boston University actually considered his NCP data, or that his NCP had income that would have resulted in a decreased aid award. Absent an allegation that the schools he attended considered his NCP data, Hansen could not have been harmed by any alleged agreement relating to that data. And even if Hansen had alleged that American and Boston University considered his NCP data, that would only matter if his family finances were structured in such a way that consideration of his NCP data would have necessarily resulted in a decreased financial aid award. But Hansen does not allege that either.

*Third*, neither Plaintiff alleges facts suggesting that any School required NCP data only because of the alleged agreement. Compl. ¶¶ 11-12. Nowhere in the Complaint do Plaintiffs allege that the schools they attended or applied to either (1) began requiring NCP data only in or after 2006 when the purported agreement was made, or (2) continued requiring such data only because of the alleged agreement to do so. In fact, Plaintiffs acknowledge that some (unidentified) schools required the submission of NCP data before the alleged conspiracy supposedly commenced in 2006. *Id.* ¶¶ 70-70[A]. Moreover, even if the Complaint had plausibly alleged that the schools Plaintiffs attended (or applied to) required NCP data only because of the alleged

---

[12] Plaintiff Chang's claim suffers from an additional defect—namely, that she has previously released the claim she asserts here against Defendants Brown, Columbia, Dartmouth, Duke, Emory, Northwestern, Rice, and Yale. These Schools intend to seek relief regarding Chang's violation of the release in the appropriate forum, if necessary.

agreement, it *does not* plausibly allege that consideration of that data reduced their respective financial aid awards. Nor does the Complaint allege any facts about what methodologies the schools they chose to attend (or applied to) would have used but for the alleged agreement and how Plaintiffs would have been better off under that unspecified methodology.

Instead, Plaintiffs simply allege that Defendants' purported agreement "significantly injured Plaintiff[s] … by artificially reducing the financial aid they were offered and received." Compl. ¶ 103. Such conclusory allegations are manifestly inadequate to support a plausible inference that Plaintiffs would have received larger financial aid awards "but for" the Schools' alleged agreement to require the submission of NCP data. *See, e.g.*, *Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*, 940 F.3d 971, 979 (7th Cir. 2019) ("[Plaintiff] merely states these assertions in a conclusory fashion and fails to allege factual allegations supporting the existence of an antitrust injury. We will not accept such allegations as true."). Indeed, the only specific facts Plaintiffs allege about their financial aid awards are that Hansen received $15,000 in annual financial aid when he enrolled at American University and $20,000 in annual financial aid when he transferred to Boston University. Compl. ¶ 11. If anything, these allegations demonstrate the individualized nature of each school's financial aid awards and that schools continued to compete by offering different awards based on each school's independent analysis.

Furthermore, Plaintiffs provide no allegations of what the "but for" world would look like for any of the 40 Schools, *see Humira*, 465 F. Supp. 3d at 843—an omission that is particularly problematic given their allegation that some schools collected NCP financial information even before the start of the alleged conspiracy, Compl. ¶ 70. In the "but for" world, presumably some schools would still independently decide to collect NCP financial information; and some schools might collect information from only custodial parents, including stepparents. It is not clear that

32

any given student would necessarily be better off under one of these regimes than the other. If a student had an extremely wealthy stepparent, for example, considering an NCP's financial information instead of their custodial stepparent's could result in a *more generous* financial aid award. When that fact is layered on top of the reality that financial aid calculations are inherently individualized—involving discussions between individual schools and applicants, such as occurred with Plaintiff Chang, *id.* ¶ 12—determining whether any harm occurred becomes hopelessly speculative, and Plaintiffs have failed in their burden of plausibly alleging antitrust injury. *See Loeb Indus., Inc.*, 306 F.3d at 485; *Humira*, 465 F. Supp. 3d at 846 ("The complaint requires drawing a conclusion that rests on too many inferences and reveals a theory of antitrust injury that is speculative as a matter of law.").

## IV. Plaintiff Chang's Claim Is Time-Barred

The Court should dismiss Chang's claim as untimely. The antitrust statute of limitations runs for four years "after the cause of action accrued." 15 U.S.C. § 15b. Accrual occurs when "a defendant commits an act that injures" the plaintiff. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Chang alleges that she attended Cornell from 2017 to 2021, and that "[b]efore applying to colleges" she submitted "financial aid forms including the CSS Profile." Compl. ¶ 12. As part of the process of submitting financial aid forms before Fall 2017, she alleges that both her custodial parent and noncustodial parent "were required to provide information to support her aid application." *Id.* By her own allegations, her claim of injury accrued in conjunction with her matriculation in 2017, when her custodial parent allegedly paid more for her to attend Cornell due to the alleged conspiracy. Accordingly, the four-year statute of limitations for her claim expired more than three years before the Complaint was filed in 2024.

Chang has pleaded no basis to support delayed accrual under the discovery rule or tolling of the statute of limitations under any equitable tolling doctrine, as is her burden. *See Dent v.*

33

*Charles Schwab & Co.*, 121 F.4th 1352, 1353 (7th Cir. 2024) ("[T]he burden is on the party seeking application to demonstrate that [tolling] is warranted.").  She also fails to plead that she suffered a fresh injury from a continuing violation within the limitations period.

### A.      The Discovery Rule Does Not Save Chang's Untimely Claim

Plaintiffs attempt to salvage Chang's untimely claims by alleging that she did not discover her injury until weeks before filing the Complaint—and that no person exercising reasonable diligence could have discovered the alleged conspiracy until the last two years.  Compl. ¶¶ 106-107.  These are nothing more than legal conclusions.  *See Twombly*, 550 U.S. at 564.  Plaintiffs allege no facts to support the assertion that Chang did not discover the alleged conspiracy or her supposed injury until weeks before filing the Complaint.  *See* Compl. ¶¶ 12, 106-107.  Chang admits she filed the CSS Profile and knew her NCP was required to provide financial information as part of that process, and she also admits that she knew her request to remove her NCP's income from consideration was denied and that the denial of that request allegedly decreased the amount of aid she was awarded—all before her matriculation at Cornell in 2017.  *Id.*  Thus, she knew of her alleged injury by 2017.

The Seventh Circuit has recognized a discovery rule of accrual for antitrust cases that postpones the beginning of the limitations period to the date when the plaintiff discovers or should have discovered his injury.  *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006).[13]  But

---

[13] Although Defendants acknowledge that this Court is bound by the Seventh Circuit's holding that the discovery rule applies to Sherman Act claims, Defendants note—and reserve their right to argue on appeal, if necessary—that *In re Copper* and its progeny were wrongly decided, as evidenced by the fact that every other circuit to have considered the question has refused to apply the discovery rule to Sherman Act claims. *See, e.g.*, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 180 (1997) (noting that in antitrust cases "a cause of action accrues . . . when a defendant commits an act that injures a plaintiff's business."); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 246 n.8 (3d Cir. 2001) (noting that, unlike RICO claims, "antitrust claims are subject to the less plaintiff-friendly 'injury occurrence' accrual rule"); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) ("We do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run.").

"[t]he discovery rule does not permit the victim of an alleged wrong to postpone the running of the statute of limitations by willfully closing his eyes, ostrich-like, to a known probability that he has been injured, even if he is not certain." *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000). Rather, the statute of limitations begins to run when the plaintiff "by exercise of *due diligence* would have discovered, that he has been *injured* and who *caused* the injury." *Id.* (emphasis in original). "A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations—the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009).

Plaintiffs allege that Chang could not have discovered her claim until 2024 because she "did not know either (a) the extent to which Defendants conspired or (b) that the NCP Cartel caused [her] financial injury." Compl. ¶ 106. They further allege that "until the last two years," "a person exercising reasonable diligence" could not have discovered their injury and who caused it for the same reasons. *Id.* ¶ 107. These conclusory assertions are inadequate to invoke the discovery rule. *See Hoagland v. Town of Clear Lake, Ind.*, 344 F. Supp. 2d 1150, 1162-63 (N.D. Ind. 2004) (refusing to apply the discovery rule based on the plaintiff's "conclusory allegation that he 'could not obtain a copy' of the ordinances" that formed the basis of his claim), *aff'd*, 415 F.3d 693 (7th Cir. 2005); *accord DeBartolo v. United Healthcare Servs., Inc.*, 2010 WL 3420316, at *3 (N.D. Ill. Aug. 27, 2010) (finding the plaintiff's "conclusory assertion" that he could not ascertain the nature and extent of his injury because of the defendant's failure to respond to his inquiries was "not sufficient to invoke the discovery rule"). Indeed, Chang does not even articulate what it is that she purportedly learned "within the last two years," or how she learned it.

35

The Complaint makes clear that Chang would have discovered her alleged injury in 2017 had she exercised the due diligence required by the discovery rule. *See In re Sulfuric Acid*, 703 F.3d at 1014 ("[T]he discovery rule requires diligence."). *First*, while Plaintiffs contend that Chang did not know the extent to which Defendants conspired, Compl. ¶ 106, the information relied on in the Complaint to allege the conspiracy and its participants has long been publicly available. Plaintiffs allege that a November 2005 article published in *Inside Higher Ed* revealed that College Board and the Schools jointly developed the alleged "NCP Agreed Pricing Strategy." *Id.* ¶ 70. Plaintiffs further allege that College Board's website has identified each institution that requires applicants to submit NCP financial information, but they do not allege that this information only became available within the limitations period. *Id.* ¶ 83. Chang therefore is charged with knowledge of the supposed unlawful agreement in 2017 given the publicly available websites and articles cited in the Complaint listing which Schools require NCP financial information. *Cf. Tomlinson v. Goldman, Sachs & Co.*, 682 F. Supp. 2d 845, 848 (N.D. Ill. 2009) (holding that discovery rule did not apply where publicly available information revealed that the defendant committed wrongful acts related to the plaintiff's claim), *aff'd sub nom. Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533 (7th Cir. 2011).

*Second*, Plaintiffs contend that Chang did not know she was injured. Compl. ¶ 106. Chang should have known in 2017 that she received financial aid from one of the schools listed on College Board's website that requires financial aid applicants to submit NCP financial information. Accordingly, due diligence would have revealed her supposed injury and who caused it in 2017.

*Henry v. Brown University* does not support a different result. There, on the motion to dismiss, the court credited the plaintiffs' allegations "that the complexity of financial aid, combined with the fact that the information publicly available had to be pieced together 'like a

jigsaw puzzle,' made it such that a reasonably diligent person would not have been able to discover the injury until a date within the limitations period." 621 F. Supp. 3d at 892. Here, Chang does not (and cannot) claim that she had to piece together publicly available information "like a jigsaw puzzle" because her claim challenges the Schools' alleged collection of *one* piece of information in the financial aid process that she knew at the time caused her financial aid award to decrease, and unlike *Henry*, this case does not involve the applicability of an antitrust exemption to the alleged conspiratorial conduct.

### B. The Continuing Violation Doctrine Does Not Apply

Plaintiffs also try to save Chang's untimely claim by alleging that Chang suffered a continuing violation, phrased as a "continuous accrual," Compl. ¶ 104, during the four-year limitations period because she received her final financial aid award in 2021. They specifically assert that Plaintiffs' claims accrued "upon each transaction" at an allegedly inflated price. *Id.* However, Chang's alleged injury accrued in 2017 when she first received allegedly less financial aid due to Cornell's consideration of her NCP financial information pursuant to Cornell's supposed agreement with the other Schools in 2006 to consider NCP financial information in their financial aid decisions. She does not even allege that NCP financial information was submitted in subsequent years that she attended Cornell, or that it had any impact on her aid awards through 2021. And regardless, any such harm suffered in subsequent awards would constitute a manifestation of the 2017 action. *Zenith Radio*, 401 U.S. at 339 ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and *all provable damages that will flow in the future from the acts of the conspirators on that date*." (emphasis added)).

The continuing violation doctrine allows an antitrust defendant's "overt act" to restart the statute of limitations. *Farag v. Health Care Serv. Corp.*, 2017 WL 2868999, at *9 (N.D. Ill. July

5, 2017).  However, "acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations."  *Midwestern Mach. Co. v. Northwest Airlines, Inc.,* 392 F.3d 265, 270 (8th Cir. 2004).

Chang's claim of injury in 2021 from her final financial aid award are "merely unabated inertial consequences" from Cornell's alleged pre-2017 decision to consider NCP financial information in financial aid awards.  *Id.*  *Choh* recently addressed this issue in a similar context.  There, the plaintiffs argued that each annual decision by the defendant schools not to award them athletic scholarships constituted a new overt act that reset the statute of limitations.  2024 WL 4465476, at *12.  The court disagreed, finding that the "failure of Brown to award [the plaintiff] an athletic scholarship . . . during the remainder of his time at Brown was simply a manifestation of the [initial] overt act, namely Brown's decision to enter into the most recent version of the Ivy League Agreement."  *Id.*  The same is true here.  Chang received her first financial aid award in 2017, and there is no allegation that Cornell's need-based aid policies changed during her matriculation, so each subsequent year was simply "a manifestation of the [initial] overt act" of adopting that NCP policy in the first place.  *Id.*  Accordingly, Chang did not suffer a fresh injury from a continuing violation within the limitations period.[14]

In any event, Chang's claim is untimely even if each year's financial aid award constitutes a continuing violation.  Financial aid awards are necessarily issued *before* the academic term they apply to begins, meaning there was no "transaction" between Chang and Cornell within the limitations period.  Because Chang graduated in spring 2021, Compl. ¶ 12, she would have

---

[14] Again, the *Henry* decision is inapposite.  There, the court rejected only the defendants' contention that "the alleged conspiracy [was] to restrain competition for only the initial award," reasoning that the plaintiffs alleged "a conspiracy to fix financial aid awards generally."  *Henry*, 621 F. Supp. 3d at 892.  Thus, the *Henry* court never grappled with the distinct question presented here and addressed by *Choh*—i.e., whether financial aid awards following a student's initial award qualify as new overt acts.

received her final award letter before the 2020-2021 academic year began and thus before the limitations period commenced on October 7, 2020.

In sum, Chang's claim should be dismissed as untimely because she challenges only a decades-old policy that was not concealed, and any alleged injuries she suffered as a result of that policy accrued more than four years ago.

## **CONCLUSION**

For the reasons above, Plaintiffs' claims are legally deficient, and amendment would be futile.  Thus, the Court should dismiss the Complaint with prejudice.


Respectfully submitted,

/s/ Amy B. Manning
Amy B. Manning, Il. Bar No. 6209407
Angelo M. Russo
Sarah A. Zielinski
Christopher J. Karamanos
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
Tel.: (312) 849-8100
amanning@mcguirewoods.com
arusso@mcguirewoods.com
szielinski@mcguirewoods.com
ckaramanos@mcguirewoods.com

*Counsel for Defendant American University*

/s/ Edward M. Casmere
Edward M. Casmere (ARDC No. 6273787)
NORTON ROSE FULBRIGHT US LLP
1045 W. Fulton Market, Suite 1200
Chicago, IL 60607
Tel.: (312) 964-7778
ed.casmere@nortonrosefulbright.com

Layne E. Kruse (admitted *pro hac vice*)
Darryl W. Anderson (admitted *pro hac vice*)
Carlos R. Rainer (admitted *pro hac vice*)
Eliot Fielding Turner (admitted *pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Tel.: (713) 651-5151
layne.kruse@nortonrosefulbright.com
darryl.anderson@nortonrosefulbright.com
carlos.rainer@nortonrosefulbright.com
eliot.turner@nortonrosefulbright.com

*Counsel for Defendant Baylor University*

/s/ Matthew Kutcher
Matthew Kutcher
COOLEY LLP
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Tel.: (312) 881-6500
Facsimile: (312) 881-6598
mkutcher@cooley.com

Deepti Bansal (admitted *pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, Suite 700
Washington, DC 20004
Tel.: (202) 842-7800
Facsimile: (202) 842-7899
dbansal@cooley.com

*Counsel for Defendants Boston College,
Boston University, Brandeis University,
Northeastern University, Tufts University and
Worcester Polytechnic Institute*

/s/ Kenneth M. Kliebard
Kenneth M. Kliebard, Il. Bar No. 6201479
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60605-1511
Tel.: (312) 324-1774
kenneth.kliebard@morganlewis.com

Jon R. Roellke (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel.: (202) 739-5754
jon.roellke@morganlewis.com

Noah J. Kaufman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Tel.: (617) 341-7590
noah.kaufman@morganlewis.com

*Counsel for Defendant Brown University*

/s/ Christopher E. Ondeck
Christopher E. Ondeck
Stephen R. Chuk (admitted *pro hac vice*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW, Ste 600
Washington, DC 20004
Tel.: (202) 416-6800
condeck@proskauer.com
schuk@proskauer.com

Todd J. Ohlms
PROSKAUER ROSE LLP
70 W. Madison, Suite 3800
Chicago, IL 60602
Tel.: (312) 962-3537
tohlms@proskauer.com

Jared DuBosar
PROSKAUER ROSE LLP
255 Glades Road, Suite 421
Boca Raton, FL 33431-7360
Tel.: (561) 995-4702
jdubosar@proskauer.com

*Counsel for Defendant California Institute of Technology*

/s/ James A. Morsch
James A. Morsch
Eleanor C. Riordan
SAUL EWING LLP
161 N. Clark Street, Suite 4200
Chicago, IL 60601
(312) 876-7866
jim.morsch@saul.com
eleanor.riordan@saul.com

Jason W. McElroy
SAUL EWING LLP
1919 Pennsylvania Ave. NW, Suite 550
Washington, DC 20006
(202) 295-6642
jason.mcelroy@saul.com

*Counsel for Defendants Carnegie Mellon University and Wake Forest University*

/s/ *Bridget S. McCabe*

Bridget S. McCabe (*pro hac vice*)
BAKER & HOSTETLER LLP
1900 Avenue of the Stars, Suite 2700
Los Angeles, CA 90067
Tel.: 310.422.8844
bmccabe@bakerlaw.com

Carole S. Rendon, Il. Bar No. 6200217
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square, Suite 2000
Cleveland, OH  44114
Tel.: 216.861.7420
crendon@bakerlaw.com

Gregory J. Commins Jr. (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, D.C.  20036
Tel.: 202.861.1536
gcommins@bakerlaw.com

Jennifer M. Kurcz, Il. Bar No. 6279893
BAKER & HOSTETLER LLP
One North Wacker Drive, Suite 3700
Chicago, IL  60606
Tel.: 312.416.6282
jkurcz@bakerlaw.com

*Counsel for Defendant Case Western Reserve University*

/s/ *David Gringer*

Seth Waxman (*pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Tel.: 202-663-6800
seth.waxman@wilmerhale.com

David Gringer
Alan Schoenfeld (*pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel.: 212-230-8800
david.gringer@wilmerhale.com
alan.schoenfeld@wilmerhale.com

*Counsel for Defendants College Board and Trustees of the University of Pennsylvania*

42

/s/ Amy L. Van Gelder
Amy L. Van Gelder
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
320 South Canal Street
Chicago, Illinois 60606
Tel.: 312-407-0903
amy.vangelder@skadden.com

Karen Hoffman Lent
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
One Manhattan West
New York, New York 10001-8602
Tel.: 212-735-3276
karen.lent@skadden.com

*Counsel for Defendant Trustees of Columbia University in the City of New York*

/s/ Norman Armstrong
Norman Armstrong, Jr. (Il. Bar No. 960605001)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel.: 202-389-5000
norman.armstrong@kirkland.com

Emily T. Chen (Il. Bar No. 5461116)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: 212-446-4800
emily.chen@kirkland.com

Daniel E. Laytin (Il. Bar No. 6257119)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Tel.: 312-862-2000
daniel.laytin@kirkland.com

*Counsel for Defendant Cornell University*

/s/ Douglas E. Litvack
Douglas E. Litvack (NDIL Bar No. 1024873)
Ishan K. Bhabha (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001-4412
Tel.: (202) 637-6357
DLitvack@jenner.com
IBhabha@jenner.com

*Counsel for Defendants Trustees of
Dartmouth College and William Marsh Rice
University*

/s/ Christopher D. Dusseault
Christopher D. Dusseault (*pro hac vice pending*)
Sarah M. Kushner (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000
CDusseault@gibsondunn.com
SMKushner@gibsondunn.com

Rachel S. Brass (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Tel.: 415-393-8200
RBrass@gibsondunn.com

Elizabeth A. Thompson, IL Bar No. 6304148
SAUL EWING LLP
161 North Clark Street, Suite 4200
Chicago, IL 60201
Tel.: (312) 876-7100
elizabeth.thompson@saul.com

Kayleigh T. Keilty (*pro hac vice pending*)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
Tel.: (410) 332-8919
kayleigh.keilty@saul.com

*Counsel for Duke University*

*/s/ Tina M. Tabacchi*
Tina M. Tabacchi
Christopher A. Hall
JONES DAY
110 North Wacker Dr.
Suite 4800
Chicago, IL 60606
312-782-3939
tmtabacchi@jonesday.com
chall@jonesday.com

*Counsel for Defendant Emory University*

*/s/ Jacob A. Kramer*
Joshua P. Mahoney, Ill. Bar No. 6313403
FAEGRE DRINKER BIDDLE & REATH LLP
320 South Canal Street
Chicago, IL 60606-5707
Tel.: (312) 212-6520
josh.mahoney@faegredrinker.com

Jacob A. Kramer (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW
Washington, D.C. 20005
Tel.: (202) 230-5289
jake.kramer@faegredrinker.com

Emily E. Chow (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
90 S. Seventh Street
Minneapolis, MN 55402
Tel.: (612) 766-8012
emily.chow@faegredrinker.com

*Counsel for Defendants Fordham University and Lehigh University*

/s/ Juan A. Arteaga
Neil G. Nandi
CROWELL & MORING LLP
455 N Cityfront Plaza Dr.
Suite 3600
Chicago, IL 60611
Tel: (312) 840-3108
nnandi@crowell.com

Juan A. Arteaga (*pro hac vice*)
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 223-4000
jarteaga@crowell.com

Jordan L. Ludwig (*pro hac vice*)
Sima Namiri-Kalantari (*pro hac vice*)
CROWELL & MORING LLP
515 South Flower Street
Los Angeles, CA 90071
Tel: (213) 622-4750
jludwig@crowell.com
snamiri@crowell.com

*Attorneys for George Washington University*

/s/ Britt M. Miller
Britt M. Miller
Daniel T. Fenske
Megan E. Stride
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Tel: 312-783-0600
bmiller@mayerbrown.com
dfenske@mayerbrown.com
mstride@mayerbrown.com

*Counsel for Defendant Georgetown University*

/s/ Renata B. Hesse
Renata B. Hesse (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue N.W. Suite 700
Washington, District of Columbia 20006
Tel.: (202) 956-7500
Facsimile: (202) 293-6330
hesser@sullcrom.com

Diane L. McGimsey (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
Tel.: (310) 712-6600
Facsimile: (310) 712-8800
mcgimseyd@sullcrom.com

*Counsel for Defendant Harvard University*

/s/ Jan Rybnicek
Eric Mahr (*pro hac vice*)
Jan Rybnicek (*pro hac vice*)
Daphne Lin (*pro hac vice*)
FRESHFIELDS US LLP
700 13th Street, NW
Washington, DC 20005
Tel.: 202-777-4500
eric.mahr@freshfields.com
jan.rybnicek@freshfields.com
daphne.lin@freshfields.com

*Counsel for Defendant Massachusetts Institute of Technology*

/s/ Samer M. Musallam
Jeffrey J. Bushofsky
ROPES & GRAY LLP
191 North Wacker Drive 32nd Floor
Chicago, IL 60606-4302
Tel.: 312-845-1200
jeffrey.bushofsky@ropesgray.com

Chong S. Park (*pro hac vice*)
Samer M. Musallam (*pro hac vice*)
Elizabeth T. McInerney (*pro hac vice*)
Logan D. Hovie (*pro hac vice*)
ROPERS & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Tel.: 202-508-4600
chong.park@ropesgray.com
samer.musallam@ropesgray.com
elizabeth.mcinerney@ropesgray.com
logan.hovie@ropesgray.com

*Counsel for Defendant Johns Hopkins University and University of Rochester*

/s/ Eric D. Isicoff
ISICOFF RAGATZ
601 Brickell Key Drive, Suite 750
Miami, Florida 33131
Tel: 305-373-3232
Fax: 305-373-3233
Eric D. Isicoff
Florida Bar No. 372201
Teresa Ragatz
Florida Bar No. 545170
Catherine A. Mancing
Florida Bar No. 32765
isicoff@irlaw.com
ragatz@irlaw.com
mancing@irlaw.com
aleman@irlaw.com
fernandez@irlaw.com

*Counsel for Defendant University of Miami*

47

*/s/ Daniel Petrocelli*

Daniel Petrocelli
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, CA 90067

Benjamin G. Bradshaw
bbradshaw@omm.com
Sergei Zaslavsky
szaslavsky@omm.com
Brian P. Quinn
bquinn@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006

Sondra A. Hemeryck
shemeryck@rshc-law.com
Thomas B. Quinn
tquinn@rshc-law.com
Robert P. Foley
rfoley@rshc-law.com
RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn St.
Suite 2200
Chicago, IL 60603

*Counsel for Defendant New York University*

*/s/ Scott D. Stein*

Scott D. Stein
Kathleen Carlson
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel.: (312) 853-7000
sstein@sidley.com
kathleen.carlson@sidley.com

*Counsel for Northwestern University*

48

/s/ Robert A. Van Kirk
Robert A. Van Kirk
Sarah F. Kirkpatrick
Matthew D. Heins
Feyilana Lawoyin
Cole T. Wintheiser
William J. Donnelly
WILLIAMS & CONNOLLY LLP
680 Maine Ave. SW
Washington, D.C. 20024
Tel.: 202-434-5000
rvankirk@wc.com
skirkpatrick@wc.com
mheins@wc.com
flawoyin@wc.com
cwintheiser@wc.com
wdonnellly@wc.com

*Counsel for the University of Notre Dame*

/s/ Lynn H. Murray
Lynn H. Murray
Maveric Ray Searle
Mehgan E.H. Keeley
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel.: (312) 704-7700
lhmurray@shb.com
msearle@shb.com
mkeeley@shb.com

Ryan M. Sandrock
SHOOK, HARDY & BACON L.L.P.
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel.: (415) 544-1900
rsandrock@shb.com

Holly Pauling Smith (admitted *pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Tel.: (816) 474-6550
hpsmith@shb.com

*Counsel for Defendant University of Southern California*

/s/ Matthew A. Kairis
Matthew A. Kairis
JONES DAY
2727 N. Harwood Street, Suite 600
Dallas, TX 75201
Tel.: (214) 969-3605
makairis@jonesday.com

*Counsel for Defendant Southern Methodist University*

/s/ Jacob R. Sorensen
Jacob R. Sorensen (*pro hac vice*)
Stacie O. Kinser (*pro hac vice*)
Natalie Truong (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Tel.: (415) 983-1000
jake.sorensen@pillsburylaw.com
stacie.kinser@pillsburylaw.com
natalie.truong@pillsburylaw.com

*Counsel for Defendant The Board of Trustees of The Leland Stanford Junior University*

49

/s/ Andre Geverola
Andre Geverola
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison, Suite 4200
Chicago, IL 60602-4231
Telephone:  (312) 583-2300
Fax:  (312) 583-2360
andre.geverola@arnoldporter.com

C. Scott Lent (admitted *pro hac vice*)
Leah J. Harrell (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689
scott.lent@arnoldporter.com
leah.harrell@arnoldporter.com

*Counsel for Defendant Syracuse University*

/s/ Julie C. Webb
Julie C. Webb
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Drive, Suite 4100
Chicago, IL 60606
Tel.: (312) 443-0700
julie.webb@troutman.com

Daniel J. Boland (*pro hac vice forthcoming*)
Michael J. Hartman (*pro hac vice forthcoming*)
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Tel.: (215) 981-4000
daniel.boland@troutman.com
michael.hartman@troutman.com

*Counsel for Defendant Villanova University*

/s/ Justin W. Bernick
Justin W. Bernick, N.D. Ill. Bar No. 988245
Jennifer Fleury, N.D. Ill. Bar No. 187503
Christopher M. Fitzpatrick, N.D. Ill. Bar No.
1614784
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Tel.: (202) 637-5600
justin.bernick@hoganlovells.com
jennifer.fleury@hoganlovells.com
chris.fitzpatrick@hoganlovells.com

*Counsel for Defendant Tulane University*

/s/ Charles A. Loughlin
Charles A. Loughlin (Bar No: 448219)
Benjamin F. Holt (Bar No: 483122)
Jamie Lee (Bar No: 1643135)
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
jamie.lee@hoganlovells.com

*Counsel for Defendant Yale University*

_/s/ Ryan P. Phair_

Ryan P. Phair (#479050)
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036
Tel.: (202) 551-1700
ryanphair@paulhastings.com

Renato T. Mariotti (#6323198)
PAUL HASTINGS LLP
71 S. Wacker Drive
45th Floor
Chicago, IL 60606
Tel.: (312) 499-6005
renatomariotti@paulhastings.com

_Counsel for Defendant Washington University
in St. Louis_