# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MAXWELL HANSEN and EILEEN CHANG, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | No. 24 C 9667 |
| v. | ) ) | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, COLLEGE BOARD, AMERICAN UNIVERSITY, BAYLOR UNIVERSITY, BOSTON COLLEGE, BOSTON UNIVERSITY, BRANDEIS UNIVERSITY, BROWN UNIVERSITY, CALIFORNIA INSTITUTE OF TECHNOLOGY, CARNEGIE MELLON UNIVERSITY, CASE WESTERN RESERVE UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, DUKE UNIVERSITY, EMORY UNIVERSITY, FORDHAM UNIVERSITY, GEORGE WASHINGTON UNIVERSITY, GEORGETOWN UNIVERSITY, HARVARD UNIVERSITY, THE JOHNS HOPKINS UNIVERSITY, LEHIGH UNIVERSITY, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, UNIVERSITY OF MIAMI, NEW YORK UNIVERSITY, NORTHEASTERN UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, WILLIAM MARSH RICE UNIVERSITY, UNIVERSITY OF ROCHESTER, UNIVERSITY OF SOUTHERN CALIFORNIA, SOUTHERN METHODIST UNIVERSITY, STANFORD UNIVERSITY, SYRACUSE UNIVERSITY, TUFTS UNIVERSITY, TULANE UNIVERSITY, VILLANOVA UNIVERSITY, WAKE FOREST UNIVERSITY, WASHINGTON UNIVERSITY IN SAINT LOUIS, WORCESTER POLYTECHNIC INSTITUTE, and YALE UNIVERSITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Plaintiffs Maxwell Hansen and Eileen Chang filed this putative class action lawsuit against the College Board and 40 universities: American University ("American"), Baylor University ("Baylor"), Boston College, Boston University ("BU"), Brandeis University, Brown University, California Institute of Technology, Carnegie Mellon University ("Carnegie Mellon"), Case Western Reserve University ("Case Western"), the Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Duke University ("Duke"), Emory University ("Emory"), Fordham University ("Fordham"), George Washington University ("George Washington"), Georgetown University ("Georgetown"), Harvard University ("Harvard"), The Johns Hopkins University ("Johns Hopkins"), Lehigh University ("Lehigh"), Massachusetts Institute of Technology ("MIT"), University of Miami ("Miami"), New York University ("NYU"), Northeastern University, Northwestern University, University of Notre Dame du Lac, the Trustees of the University of Pennsylvania ("Penn"), William Marsh Rice University ("Rice"), University of Rochester, University of Southern California ("USC"), Southern Methodist University ("SMU"), Stanford University, Syracuse University ("Syracuse"), Tufts University, Tulane University ("Tulane"), Villanova University, Wake Forest University ("Wake Forest"), Washington University in Saint Louis ("WashU"), Worcester Polytechnic Institute, and Yale University (collectively, the "University Defendants"). Plaintiffs allege that the College Board and the University Defendants (collectively, "Defendants") violated Section 1 of the Sherman Act by engaging in concerted action to require a noncustodial parent ("NCP") of any applicant seeking non-federal financial aid to provide their financial information (the "NCP Agreed Pricing Strategy"), which allegedly substantially increased Plaintiffs' and the putative class members' costs to attend

college.  Plaintiffs contend that absent this agreement, the University Defendants would have competed to offer better financial aid packages to students in an effort to enroll their top candidates.  Defendants have moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Certain non-Illinois Defendants—specifically, Baylor, Carnegie Mellon, Case Western, Duke, Emory, Fordham, Georgetown, Harvard, Lehigh, MIT, Penn, SMU, Tulane, Miami, and Wake Forest (collectively, the "Non-Illinois Defendants")—have moved to dismiss Plaintiffs' claims against them for lack of personal jurisdiction and improper venue pursuant to Rules 12(b)(2) and 12(b)(3).  Because the Court does not have personal jurisdiction over the Non-Illinois Defendants, the Court dismisses them from the case without prejudice.  And because Plaintiffs have not plausibly alleged that Defendants entered into an agreement as required to pursue their Section 1 claim, the Court dismisses the complaint without prejudice.

## BACKGROUND[1]

### I.    Defendants

The College Board develops and administers standardized methodologies for the college admissions process.  The University Defendants belong to the College Board.  The University Defendants' employees attend College Board meetings, supervise College Board operations, and participate in the development of College Board aid methodologies and standards.

---

[1] The Court takes the facts in the background section from the complaint and presumes them to be true for the purpose of resolving Defendants' Rule 12(b)(6) motion to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).  Although the Court normally cannot consider extrinsic evidence without converting a Rule 12(b)(6) motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).  The Court also considers the affidavits submitted in connection with the Non-Illinois Defendants' motion to dismiss in addressing personal jurisdiction and venue.  *See Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782–83 (7th Cir. 2003) (Rule 12(b)(2)); *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809–10 (7th Cir. 2016) (Rule 12(b)(3)).

The Board of Trustees is the College Board's governing body, elected by College Board member delegates. It consists of thirty-one members. Representatives of BU, Columbia, Duke, George Washington, Johns Hopkins, NYU, USC, and WashU have served or currently serve on the College Board's Board of Trustees. The Vice Provost for Admissions and Financial Aid at WashU chaired the Board of Trustees from 2020 to 2022.

The College Board has three national assemblies that provide guidance on specific issues and College Board activities related to these issues. The CSS Financial Assistance Assembly Council "considers issues, research, policies, programs, and standards related to providing financial guidance and assistance to students, including all economic aspects of postsecondary attendance, affordability, and access." *Id.* ¶ 63. Representatives of Columbia, Harvard, Johns Hopkins, MIT, Penn, and WashU have served or currently serve on the CSS Financial Assistance Assembly Council. A Johns Hopkins representative previously chaired the Council, and a Columbia representative currently serves as its chair.

The Financial Aid Standards and Services Advisory Committee (the "FASSAC") operates under the CSS Financial Assistance Assembly Council and draws its members from economists and representatives of selective colleges. The FASSAC designs and implements the formula for the Institutional Methodology, explained below. Duke, Harvard, Penn, and Syracuse have had representatives on the FASSAC.

## II.    Financial Aid Determinations

A college student's financial aid package can include need-based federal and non-federal funding. The federal government uses the Federal Methodology to determine eligibility for need-based federal funding, such as Pell Grants. The Federal Methodology uses information that

applicants submit through the Free Application for Federal Student Aid ("FAFSA"). Some states also use the FAFSA to assess financial aid.

The College Board administers the CSS Profile, an "online application used by colleges and scholarship programs to award non-federal institutional aid." Doc. 1 ¶ 4. Approximately 250 institutions require students to submit a CSS Profile to receive non-federal need-based financial aid. The CSS Profile has more stringent requirements for aid eligibility than the FAFSA. Schools that require students to submit a CSS Profile use the Institutional Methodology, which provides an "economically sound measure of family financial strength." College Board, Institutional Methodology, https://secure-media.collegeboard.org/digitalServices/pdf/professionals/institutional-methodology.pdf (last visited Sept. 15, 2025).[2] The College Board, in partnership with financial aid leaders, develops and maintains the Institutional Methodology. The FAFSA does not consider NCP information, while, as of 2006, the Institutional Methodology allows schools to request NCP information as part of the application.

Before 2006, schools took various approaches to considering parental assets in making financial aid determinations. Many schools focused on the custodial parent's assets. According to a Vice President at Syracuse, institutions that only considered a custodial parent's assets could offer students better aid packages and improve those institutions' yield (the percentage of admitted students who enroll) over institutions that considered both parents' assets. The College Board FASSAC developed the NCP Agreed Pricing Strategy in 2006 to standardize consideration of NCP assets amongst its members. The University Defendants had "prominent involvement" in the development of this strategy. Doc. 1 ¶ 70. Sally Donahue, Harvard's

---

[2] The Court includes this description of the Institutional Methodology, which it takes from a College Board document from which Plaintiffs quote in their complaint. *See* Doc. 1 at 30 n.72. The Court also notes that the document describes the "flexibility" of the Institutional Methodology, noting that it "can be tailored to meet institutional goals and to address the special circumstances of schools and programs, students, and their families." College Board, Institutional Methodology.

Director of Financial Aid, chaired the FASSAC at the time it developed the NCP Agreed Pricing Strategy, and Donald Feehan, a Vice President at Syracuse, served on the FASSAC at that time. Julia Benz, a Director of Financial Aid at Rice, also made public statements advocating for the NCP Agreed Pricing Strategy in 2006.

The College Board sent letters to its members urging them to follow the NCP Agreed Pricing Strategy in 2006. It explained that the FASSAC reached consensus on the following: (1) "[t]here should be a consistent approach among institutions to the analysis of family data when birth/adoptive parents do not live in the same household"; (2) "[t]he definition of family should be viewed as a set of relationships rather than a domestic unit"; (3) "[t]he standard [parental contribution] should include an assessment of the noncustodial parent's resources calculated in a format parallel to that of the custodial parent contribution"; (4) "[t]he College Board is uniquely structured to serve as the facilitating center for data collection, methodology development and operational implementation;" and (5) "[f]inal decisions on the requirement for and use of noncustodial data must be determined by *institutional policy and procedure*." *Id.* ¶ 75; Doc. 234-3 at 3.

Completing the CSS Profile requires tax returns, W-2 forms and other records of income, records of untaxed income and benefits, assets, and bank statements. The CSS Profile webpage indicates that some colleges may require both custodial and noncustodial parents to complete the CSS Profile. For those schools that have adopted the NCP Agreed Pricing Strategy, the College Board sends students an email indicating that both parents must provide their financial information with no exceptions, even if a divorce court order concerning college expenses exists. Schools then use formulas to generate financial aid offers, with students receiving an estimate for

6

the family contribution based on what both parents can contribute, regardless of whether both parents actually contribute.

At least 75 schools immediately adopted the NCP Agreed Pricing Strategy in 2006, including Cornell, Dartmouth, Fordham, Georgetown, Harvard, and non-Defendants Colgate and the University of Chicago. As of the filing of the complaint, all of the University Defendants required applicants seeking non-federal financial aid to provide both custodial and noncustodial parents' financial information through the CSS Profile. Their financial aid websites link to the CSS Profile website, which the College Board hosts. The University Defendants have all agreed to consider the income of the NCP in determining their aid awards.

The adoption of the NCP Agreed Pricing Strategy at least doubled the available parental assets for a significant minority of students, those from single-parent households. It has also caused an increase in the net price of education, in other words, the cost per student of tuition plus room and board, decreased by financial aid. The average net price of education at the University Defendants is approximately $6,200 more than the ten non-NCP universities in the top 50 private universities.[3] The need to provide NCP information also means that disadvantaged students may not be able to provide all the information required by the NCP schools.

## III.    Plaintiffs' Financial Aid Experiences

Hansen attended American from fall 2021 to fall 2023 and then transferred to BU. Before applying to college, he submitted a CSS Profile. Both his custodial parent and NCP provided information to support his aid application. He indicated he expected that his NCP

---

[3] Plaintiffs identify the 10 universities in the top 50 private universities that do not require NCP financial information as Gonzaga University, Loyola Marymount University, Pepperdine University, Princeton University, Rensselaer Polytechnic Institute, Santa Clara University, Vanderbilt University, and Yeshiva University. They also indicate that, based on undergraduate attendance, the University Defendants have an 84% market share of the top 50 private schools.

would contribute $0 toward his educational expenses. Hansen received approximately $15,000 per year in financial aid from American and approximately $20,000 per year in financial aid from BU. His mother has co-signed loans to pay the rest of his tuition, and his father has not contributed to his educational expenses.

Chang attended Cornell from 2017 to 2021. Before applying to colleges, she submitted financial aid forms, including the CSS Profile. Her NCP is on disability with a much higher income than her custodial parent. When Chang attended Cornell, tuition was approximately $70,000 per year. She received both federal and non-federal need-based financial aid. Chang emailed Cornell's financial aid office to inquire about removing her NCP's income from the calculation, indicating that her NCP could not contribute to her educational expenses given the NCP's disability. Cornell's financial aid office nonetheless indicated that it expected NCPs to help pay tuition. Chang's custodial parent took out a Parent Plus loan to pay the remainder of Chang's tuition.

## ANALYSIS

### I. Rule 12(b)(2) and Rule 12(b)(3) Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue

The Court first addresses the Non-Illinois Defendants' motion to dismiss Plaintiffs' claims against them for lack of personal jurisdiction and improper venue. A motion to dismiss under Rule 12(b)(2) challenges the Court's jurisdiction over a party. Fed. R. Civ. P. 12(b)(2). When a defendant raises a Rule 12(b)(2) challenge, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (citation omitted). If the Court rules on the Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* at 392–93; *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). In resolving a

8

Rule 12(b)(2) motion, the Court "accept[s] as true all well-pleaded facts alleged in the complaint," *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012), and "reads the complaint liberally with every inference drawn in favor of [the] plaintiff," *GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). However, if the defendant submits "evidence opposing the district court's exercise of personal jurisdiction, the plaintiffs must similarly submit affirmative evidence supporting the court's exercise of jurisdiction." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). The Court "accept[s] as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff," *GCIU-Emp. Ret. Fund*, 565 F.3d at 1020 n.1, but resolves "any factual disputes in the [parties'] affidavits in favor of the plaintiff," *Felland*, 682 F.3d at 672.

A motion to dismiss under Rule 12(b)(3) challenges the plaintiff's choice of venue as improper. Fed. R. Civ. P. 12(b)(3). "Once a defendant challenges the plaintiff's choice of venue, the plaintiff bears the burden of establishing" proper venue. *Nicks v. Koch Meat Co.*, 260 F. Supp. 3d 942, 951 (N.D. Ill. 2017). To resolve a Rule 12(b)(3) motion, the Court accepts the truth of all allegations in the complaint, unless the defendant's affidavits contradict the allegations. *Deb*, 832 F.3d at 809. The Court may consider evidence the parties submit outside the pleadings; in doing so, the Court resolves all factual conflicts and draws all reasonable inferences in the plaintiff's favor. *Id.* at 809–10; *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809–10 (7th Cir. 2011). If venue is improper, the Court must dismiss the case or, if it is "in the interest of justice," transfer the case to any district or division where the case could have been brought. *Nicks*, 260 F. Supp. 3d at 952; 28 U.S.C. § 1406(a).

Because Plaintiffs bring an antitrust claim, they can establish personal jurisdiction and venue through (1) general principles of personal jurisdiction and venue, or (2) Section 12 of the

9

Clayton Act, 15 U.S.C. § 22. *See KM Enters. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013). In their complaint, Plaintiffs focus on Section 12 of the Clayton Act, although in their response to the Non-Illinois Defendants' motion to dismiss, they also contend that Illinois law and 28 U.S.C. § 1391 provide a basis for finding they have established personal jurisdiction and venue. The Court first turns to Section 12.

### A.    Section 12

Section 12 provides for nationwide service of process and, consequently, nationwide personal jurisdiction. 15 U.S.C. § 22 ("Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."); *KM Enters., Inc.*, 725 F.3d at 724. "To avail oneself of the privilege of nationwide service of process, a plaintiff must satisfy the venue provisions of Section 12's first clause." *KM Enters.*, 725 F.3d at 730. Personal jurisdiction under Section 12 requires only that the Non-Illinois Defendants have sufficient minimum contacts with the United States, which they do, and nothing is unreasonable about requiring the Non-Illinois Defendants to submit to the federal courts' authority. *Id.* at 731. Therefore, the Court's focus turns to the propriety of venue in this District. *Id.* at 730.

Under Section 12, venue is proper where "a defendant is an inhabitant, is found, or transacts business." Only the last aspect of this definition, transacting business, possibly applies to the Non-Illinois Defendants. The Supreme Court has interpreted "transacts business" to mean "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character.'" *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948).

In their complaint, Plaintiffs allege that each Defendant has "(1) transacted business in the United States and in this District, including by recruiting, and advertising for, students residing in this District; (2) transacted business with Class Members throughout the United States, including those residing in this District; and (3) committed substantial acts in furtherance of an unlawful scheme in the United States including in this District." Doc. 1 ¶ 9. They further contend that "[e]ach Defendant has recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District." *Id.* The Court agrees with Defendants that these allegations fall short of suggesting that the Non-Illinois Defendants transact business in this District. In cases against associations focused on professional advancement, courts have found that an association does not transact business in a district based on its members' residence in the district, its advertisement in the district, or even its conduct of a program for its members in that district. *See Daniel v. Bd. of Emergency Med.*, 428 F.3d 408, 429 (2d Cir. 2005) (surveying cases and noting that "the determination whether a defendant transacted business in a district depend[s] on a realistic assessment of the nature of the defendant's business and of whether its contacts with the venue district could fairly be said to evidence the 'practical, everyday business or commercial concept of doing business or carrying on business of any substantial character'" (citation omitted)); *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979) (finding that the defendant did not transact business in the state for purposes of Section 12 despite its advertisements in the state because it had only a small number of members in the state, did not qualify to do business in the state, and had no meetings in the state, among other things), *abrogated on other grounds*, *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119 (1982); *Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426, 436–38 (5th Cir. 1977) (concluding that association did not transact business in the state based

on having members there, a magazine circulating in the state carrying institutional advertising for the association, the availability of applications to join the association in the state, the association conducting a workshop for members in the state, and the association awarding membership in a special club to individuals who scored a hole-in-one at golf clubs in the state).  While the Court has not identified applicable precedent involving universities, the application of this principle in situations involving professional associations is analogous.

Here, the University Defendants all provide educational services.  The Non-Illinois Defendants have provided declarations, however, that they do not maintain a presence in Illinois and, while some have several employees who reside in Illinois, those employees provide remote services to the Non-Illinois Defendants outside of Illinois.[4]  The declarations further indicate that the Non-Illinois Defendants make their financial aid decisions outside of Illinois.  While a small percentage of Illinois residents attend the Non-Illinois Defendants and thus are subject to the NCP Agreed Pricing Strategy, without more detail about the Non-Illinois Defendants' activities, the fact that the Non-Illinois Defendants recruit students from Illinois, draw some part of their student body from Illinois, and receive tuition payments from Illinois residents does not provide a basis to conclude that the Non-Illinois Defendants conduct business "of any substantial character" in this District.  *See Dale v. Deutsche Telekom AG*, No. 1:22-CV-03189, 2023 WL 7220054, at *5 (N.D. Ill. Nov. 2, 2023) (presentations and recruitment of employees in the district fell short of transacting business in the district for purposes of Section 12's venue prong), *motion to certify appeal granted on other grounds*, 2024 WL 1302783 (N.D. Ill. Mar. 27, 2024);

---

[4] Plaintiffs do not appear to rely on the fact that the Non-Illinois Defendants have some employees who work remotely from this District as a basis for finding venue here, nor would such an argument be successful.  *See Am. Home Healthcare Sys., Inc. v. Floyd Mem'l Hosp. & Health Servs.*, No. 3:17-cv-00048, 2017 WL 2261740, at *3 (W.D. Ky. May 23, 2017) ("The fact that some of Floyd's employees resided in Kentucky, without a showing that they transacted any business in Kentucky, is not enough to satisfy the standard for Section 12 of the Clayton Act.").

*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, No. 24-CV-01066, 2024 WL 4893266, at \*19–20 (S.D.N.Y. Nov. 26, 2024) (plaintiffs did not meet Section 12's venue prong where they did not provide allegations "as to the regularity of any recruiting activities in" the district, with conclusory allegations that the defendants had "recruited and sourced players from" the district being "plainly insufficient"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 200 (S.D.N.Y. 2018) (allegations that Australian corporation recruited students in the Southern District of New York for its New York offices did not sufficiently allege venue under Section 12 because the complaint did not include allegations "as to the regularity of such recruitment" or that the "recruitment efforts comprise a substantial component of the company's business"). Therefore, Section 12 does not provide a basis for Plaintiffs to proceed against the Non-Illinois Defendants in this case.

### B.    Specific Personal Jurisdiction

Alternatively, Plaintiffs argue that specific personal jurisdiction exists under Illinois law, with venue proper under any of § 1391's subsections. Specific jurisdiction arises "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010); *see also Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012) ("Specific jurisdiction is jurisdiction over a specific claim based on the defendant's contacts with the forum that gave rise to or are closely connected to the claim itself."). For purposes of specific jurisdiction, "[t]he relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800–01 (7th Cir. 2014). A defendant is not subject to jurisdiction solely because the plaintiff suffered injury in the forum state. *Id.* at

802.  Instead, to establish specific jurisdiction over the Non-Illinois Defendants, Plaintiffs must show that "(1) [the Non-Illinois Defendants] purposefully directed [their] activities at the forum state or purposefully availed [themselves] of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to [the Non-Illinois Defendants'] forum-related activities; and (3) any exercise of personal jurisdiction . . . comport[s] with traditional notions of fair play and substantial justice."  *Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2021).

Here, even assuming that the Non-Illinois Defendants purposefully directed their financial aid determinations at Illinois, the Court cannot exercise jurisdiction over the Non-Illinois Defendants because Plaintiffs' claims do not arise out of nor are related to that conduct. "[I]n a putative class action, the specific jurisdiction inquiry is evaluated with respect to the named plaintiffs" only, without regard to absent class members.  *Batton v. Nat'l Ass'n of Realtors*, No. 21-CV-00430, 2024 WL 689989, at *12 (N.D. Ill. Feb. 20, 2024) (citing *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445, 448 (7th Cir. 2020)); *see also Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 866 (N.D. Ill. 2016) ("Specific personal jurisdiction can arise only from the claims of the named plaintiffs, not those of absent class members.").  While Plaintiffs allege that each University Defendant has "recruited, accepted, enrolled, and charged artificially high net prices of attendance to, and thus injured, individuals residing within this District," Doc. 1 ¶ 9, Plaintiffs allege no connection between their own claims and the Non-Illinois Defendants' actions in Illinois.  Because Plaintiffs' claims do not arise out of any of the Non-Illinois Defendants' conduct directed at Illinois, the Court cannot exercise specific jurisdiction over them.  *See Kurt v. Platinum Supplemental Ins., Inc.*, No. 19 C 4520, 2021 WL 3109667, at *6–7 (N.D. Ill. July 22, 2021) (no specific jurisdiction over defendants whose contacts with Illinois did not relate to the named plaintiffs even though putative class members' injuries that occurred in

Illinois "could potentially provide the critical link between [the defendant's] Illinois-based business and a plaintiff's Illinois-based claim related to that business"); *Cooley v. First Data Merch. Servs., LLC*, No. 1:19-CV-1185, 2019 WL 13207579, at *7 (N.D. Ga. Nov. 15, 2019) ("The Plaintiffs do not allege that the calls that injured them were made from, or received in, Georgia. The Plaintiffs' claims therefore do not 'arise from' the Defendants' contacts with Georgia as required by Georgia's long-arm statute and federal due process."). Nor can the Court exercise jurisdiction over the Non-Illinois Defendants because their liability for the alleged antitrust violation would be joint and several, given that Illinois does not recognize a conspiracy theory of personal jurisdiction. *See Batton*, 2024 WL 689989, at *13 (collecting Illinois state and federal cases refusing to exercise jurisdiction over a party based on a co-conspirator's acts in Illinois).

Therefore, while arguably inefficient, the Court agrees with the Non-Illinois Defendants that the Court cannot exercise jurisdiction over them and dismisses them without prejudice from this case.[5]

## II.     Rule 12(b)(6) Motion to Dismiss

The Court now turns to Defendants' motion to dismiss pursuant to Rule 12(b)(6). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.

---

[5] This does not leave Plaintiffs without a remedy against the Non-Illinois Defendants. Plaintiffs arguably could choose to amend their complaint to add Illinois-based named plaintiffs whose claims arise out of the Non-Illinois Defendants' contacts with Illinois, or Plaintiffs could file individual actions against the Non-Illinois Defendants in their home districts, followed by a motion for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 filed before the United States Judicial Panel on Multidistrict Litigation.

*Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Plaintiffs bring an antitrust claim under § 1 of the Sherman Act.  To state a § 1 claim, Plaintiffs must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (alteration in original) (quoting *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012)).  Defendants argue that Plaintiffs have not satisfied any of these elements, but the Court need only address their arguments as to the first element at this time.

Stating a § 1 claim requires the complaint to include "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  Plausible allegations of an agreement "usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Always Towing*, 2 F.4th at 703 (quoting *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019)).  Here, Plaintiffs do not suggest that they have direct evidence of an agreement, and so the Court considers only whether Plaintiffs have sufficiently pleaded an agreement by way of circumstantial evidence.

16

Circumstantial evidence requires allegations of "parallel conduct . . . placed in a context that raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. In other words, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Instead, a plaintiff must identify "plus factors," or "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Greco v. Mallouk*, No. 22 C 2661, 2024 WL 4119169, at *6 (N.D. Ill. Sept. 9, 2024) (citation omitted). Court have recognized "plus factors" to include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (citation omitted). In reviewing the allegations for a plausible agreement, the Court "views the circumstances as a whole." *In re MultiPlan Health Ins. Provider Litig.*, No. 24 C 6795, 2025 WL 1567835, at *15 (N.D. Ill. June 3, 2025). "If the allegations are as consistent with a wide range of lawful and independent business conduct as they are with an anticompetitive agreement, then the first element of § 1 is not satisfied." *Mirage Wine + Spirit's, Inc. v. Apple Inc.*, No. 3:23-CV-3942, 2025 WL 1896006, at *3 (S.D. Ill. July 9, 2025); *see also Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 351 (7th Cir. 2022) ("*Twombly* demonstrates that courts should dismiss antitrust conspiracy complaints for failure to state a claim when the allegations, taken as true, could just as easily reflect innocent conduct or rational self-interest.").

Plaintiffs claim that Defendants entered into an agreement to reduce the amount of financial aid awarded to Plaintiffs and the putative class members by collecting and using NCP financial information to determine students' financial aid awards. According to Plaintiffs, this agreement reduced competition among the University Defendants because they all considered

the same financial information, which reduced the advantages a school that did not consider NCP financial information might have in offering better aid packages or making the aid application easier.  Plaintiffs contend that they have sufficiently alleged circumstantial evidence of Defendants' agreement to participate in the conspiracy because (1) the University Defendants' representatives regularly attend College Board meetings, supervise College Board operations, and help develop College Board policies related to financial aid; (2) the University Defendants have implemented the NCP Agreed Pricing Strategy; and (3) the University Defendants require students to submit NCP data, with the University Defendants then using that data to determine the need-based financial aid they provide to the students.

The Court agrees with Plaintiffs that they have sufficiently alleged parallel conduct, given that all University Defendants collect NCP financial information using the College Board's CSS Profile and then allegedly use that information to fashion their financial aid awards. Defendants argue, however, that the complaint does not even allege parallel conduct because not all University Defendants began to require NCP financial information at the same time, with the complaint only indicating that the University Defendants all currently require submission of such information.  "But concurrent adoption of a price-fixing scheme is not required to prove parallel conduct." *In re MultiPlan*, 2025 WL 1567835, at *14; *see also In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) ("[T]he Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct.").  Similarly, the fact that the University Defendants may not have used the NCP financial information in the same way does not necessarily defeat a finding of parallel conduct.  *See In re MultiPlan*, 2025 WL 1567835, at *15 ("If competitors agree to abide by a third-party algorithm that guarantees a below market price, it would not matter if every price the algorithm recommended differed for

18

each competitor based on each of the competitor's preferred settings. An agreement to fix prices within a below-market range through use of an algorithm is no different for antitrust purposes than an agreement to fix prices to a single point."); *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Plaintiffs do not need to allege that Defendants restricted supply in an identical manner.").

But the Court nonetheless finds that, when viewed as a whole, the complaint falls short in plausibly alleging that this parallel conduct reflects an agreement among Defendants to fix prices. While the fact that the University Defendants did not all act at once to adopt the NCP Agreed Pricing Strategy does not prevent an inference of parallel conduct, the lack of details surrounding when each University Defendant began to require NCP financial information and the potential that the period of time lasted almost twenty years calls into question whether the use of NCP financial information suggests coordinated action among all Defendants. *See Washington Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 837 (N.D. Ill. 2018) ("Even if the disparities in the magnitude and timing of the defendants' recalls does not, in and of itself, render plaintiffs' complaint implausible, it is yet another strike against the complaint's plausibility." (citations omitted)); *cf. In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (explaining that the "allegation that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third," was the "kind of 'parallel plus' behavior" that could support an inference of conspiracy); *In re Broiler Chicken*, 290 F. Supp. 3d at 791 (collecting cases of courts finding that allegations of defendants "joining or effectuating a conspiracy" over periods of five years or less sufficed to allege parallel conduct); *Mirage Wine + Spirit's, Inc.*, 2025 WL 1896006, at *3 ("Multiple bilateral agreements can evince a single

conspiracy if they are sufficiently interdependent and are executed in the context of other plus factors that suggest coordination.").

Defendants also point out that the College Board's documents indicate that each University Defendant makes the final decision as to how to use the NCP financial information gathered in the CSS Profile. According to Defendants, the University Defendants' discretion in how to use the collected data makes implausible any alleged price-fixing agreement. Indeed, Plaintiffs include only the most conclusory allegation about Defendants' agreement as to using the collected NCP financial information. While Plaintiffs do allege that the University Defendants used NCP financial information as part of the Institutional Methodology, which generated a family contribution estimate, the complaint does not go further and explain how the University Defendants used the family contribution estimate to formulate their financial aid offers or whether all University Defendants based the family contribution estimate on the same or similar factors. The conclusory nature of Plaintiffs' allegations calls into question whether Plaintiffs have alleged a plausible agreement to fix financial aid offers at the same amount or level across the board. *Cf. In re MultiPlan*, 2025 WL 1567835, at *15 (rejecting argument that use of algorithm could not be considered parallel conduct where the plaintiffs alleged that despite the "theoretical ability to deviate" from the "calculated rate," the rates actually were "more akin to mandates" and often adopted "with little to no changes").

Plaintiffs, however, emphasize that the Court can find plus factors evidencing an agreement in the University Defendants' involvement in the College Board and development of the NCP Agreed Pricing Strategy. "[T]rade organizations are ubiquitous and serve numerous legitimate and pro-competitive purposes," however. *Washington Cnty.*, 328 F. Supp. 3d at 843. For this reason, "[a]bsent additional facts addressing the content of defendants' discussions at or

the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle." *Id.*; *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) ("[A] trade association is not, just because it involves collective action by competitors, a 'walking conspiracy.'" (citation omitted)). While "[c]ommon membership, meeting attendance, and adoption of the trade groups' suggestions can . . . evidence an *opportunity* to conspire," *Kraft Food Glob., Inc. v. United Egg Producers, Inc.*, No. 11-CV-8808, 2023 WL 6065308, at *13 (N.D. Ill. Sept. 18, 2023) (alterations in original) (citation omitted) (internal quotation marks omitted), "having the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*," *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018).

Here, Plaintiffs allege that the College Board urged colleges to collect NCP financial information beginning in 2006, and that some schools followed the College Board's suggestion "immediately." Doc. 1 ¶¶ 72–73. But without more, this does not suggest a conspiracy, particularly given that the NCP Agreed Pricing Strategy is not a mandatory College Board rule and many other College Board members do not require NCP financial information as part of the CSS Profile. *See Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) ("[W]hen a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349 (3d Cir. 2010) ("[N]either defendants' membership in the CIAB, nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy. While these allegations indicate that the brokers had an opportunity to conspire, they do not plausibly imply that each broker acted other than independently when it decided to incorporate the CIAB's proposed approach as the best means of protecting its

21

lucrative arrangements from hostile scrutiny." (citations omitted)).  The non-mandatory nature of the NCP Agreed Pricing Strategy distinguishes this case from *Moehrl v. National Association of Realtors*, where the trade association conditioned membership and access to its infrastructure and resources on compliance with the association's rules, essentially forcing all real estate professionals to follow those rules.  492 F. Supp. 3d 768, 778 (N.D. Ill. 2020) ("Unlike in *Twombly*, where the plaintiffs only set forth parallel business conduct bound together by a conclusory allegation of a secret agreement, the purported anticompetitive restraints here are a product of written rules issued by the NAR that each Corporate Defendant expressly imposes upon their franchisees and realtors.").  And while Plaintiffs mention that representatives of three University Defendants—Harvard, Syracuse, and Rice—advocated for the changes or had involvement in developing the NCP Agreed Pricing Strategy, Doc. 1 ¶ 82, Plaintiffs allege that only one of those schools, Harvard, immediately adopted the NCP methodology upon its introduction, *id.* ¶ 74.  Further, Plaintiffs allege that only a handful of the other University Defendants have had representatives on the College Board financial aid committees over the past almost 20 years.  Given these sparse allegations, Plaintiffs' desired inference that the University Defendants' involvement in the College Board's committees demonstrates an agreement does not follow.  *See Washington Cnty.*, 328 F. Supp. 3d at 843 (allegations concerning membership in trade associations did not suggest unlawful agreement where "the complaint stops far short of alleging that these defendants similarly exploited the opportunities for collusion that industry associations provided"); *cf. In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 727 (trade association membership was plus factor where the trade association created a special team "to lead an industry approach of 'coopetition' to increase turkey consumption in the United States while maintaining historic profit levels"); *Kraft*, 2023 WL 6065308, at *13 (trade association

membership served as plus factor where defendants placed executives on associations' boards and committees, played "key roles in developing and approving the conspiracy's supply-reducing initiatives," and participated in the initiatives "nearly in unison"); *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at \*10 (N.D. Ill. Nov. 6, 2020) (plaintiff alleged "numerous instances in which Defendants' executives made express public statements regarding cooperation among Defendants" through a trade organization).

Plaintiffs also argue that the CSS Profile essentially functioned as an information-sharing program, in which the University Defendants exchanged highly sensitive information with the other members of the conspiracy. This, according to Plaintiffs, runs afoul of antitrust laws. *See* FTC Guide to Antitrust Laws: Spotlight on Trade Associations, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-associations (last visited Sept. 15, 2025) ("It is illegal to use information-sharing programs . . . as a disguised means of fixing prices."). But nothing in Plaintiffs' complaint suggests that the University Defendants exchanged their own internal financial aid decisionmaking processes or guidelines or otherwise shared with the other University Defendants the amount of financial aid they planned to offer a particular student. Nor does the complaint allege that the University Defendants all agreed on the same exact formula for calculating financial aid based on the NCP financial information. Plaintiffs thus cannot rely on an information exchange as a plus factor. *Cf. In re Turkey Antitrust Litig.*, 642 F. Supp. 3d at 726 (defendants' communications with each other about intended price cuts, encouragement of each other to cut supply, and exchange of information on pricing structures served as a plus factor that could facilitate price fixing); *In re Loc. TV Advert.*, 2020 WL 6557665, at \*9 (plus factor where a third party facilitated the defendants' exchange of "competitively sensitive information with one another").

In summary, having reviewed the complaint and parties' arguments as a whole, the Court finds Plaintiffs' allegations of an agreement conclusory and lacking in plausibility. For example, Plaintiffs talk about "concerted action" and "collective effort" without providing details to flesh out these conclusory descriptions. *See, e.g.*, Doc. 1 ¶ 70. Further, although Plaintiffs allege that some of the University Defendants had representatives on the relevant College Board committees, the Court has no details as to the remaining Defendants' involvement in the alleged agreement aside from the allegations that they belong to the College Board and, at some point since 2006, began requiring NCP financial information. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope."); *Greco*, 2024 WL 4119169, at *7 ("group pleading" is particularly problematic in antitrust case where the court has to "consider whether allegations about each Defendant's purported conduct is sufficient to infer an illegal agreement"). The complaint also leaves unexplained how or why this particular subset of institutions that require NCP financial information formed an agreement while leaving out others that also collect and use the same information in their financial aid determinations.[6] On a similar note, the complaint provides no basis to infer an agreement from the industry structure or the market power of a small group of institutions, given the inclusion of 40 University Defendants here. *Cf. In re Text Messaging*, 630 F.3d at 628 (the fact that the four defendants sold "90 percent of U.S. text messaging services" and that "it would not be difficult for such a small group to agree on prices"

---

[6] Defendants note that of the College Board members who use the CSS Profile, 177 institutions and programs require the submission of NCP financial information, while 93 do not. Plaintiffs have only named 40 of the 177 institutions that require NCP financial information in this lawsuit. Plaintiffs have not provided a basis to infer that these 40 institutions had some special agreement amongst themselves that would differentiate them from the remaining institutions and programs that also collect NCP financial information.

supported the existence of an agreement); *Moehrl*, 492 F. Supp. 3d at 779 (industry structure suggested collusion because the four largest real estate brokers belonged to the trade association and provided a "membership base that [gave] the [Corporate Defendants] the power to impose the [trade association's] rules upon the entire industry"). The Court acknowledges that Plaintiffs need not defeat Defendants' alternative explanations at the pleading stage. *See In re MultiPlan*, 2025 WL 1567835, at *19 (alternative explanations "cannot override a plausibly alleged agreement" at the motion to dismiss stage); *In re Broiler Chicken*, 290 F. Supp. 3d at 801 ("[T]he Supreme Court did not intend for courts to weigh the plausibility of a plaintiff's conspiracy claims against the plausibility of the defendants' alternative explanation for their conduct."). But because Plaintiffs have not plausibly plus factors that would suggest more than lawful parallel conduct, the Court cannot allow Plaintiffs to proceed on their § 1 claim at this time.[7] *See Twombly*, 550 U.S. at 556 ("[L]awful parallel conduct fails to bespeak unlawful agreement. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.").

---

[7] Although the Court does not address Defendants' remaining arguments for dismissal of the Section 1 claim, to the extent that Plaintiffs choose to replead this claim, they should carefully consider those arguments and address any other potential pleading deficiencies in an amended complaint.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' motion to dismiss [232] and the Non-Illinois Defendants' motion to dismiss [236].  The Court dismisses Plaintiffs' complaint without prejudice.  The Court dismisses Baylor University, Carnegie Mellon University, Case Western Reserve University, Duke University, Emory University, Fordham University, Georgetown University, Harvard University, Lehigh University, Massachusetts Institute of Technology, the Trustees of the University of Pennsylvania, Southern Methodist University, Tulane University, University of Miami, and Wake Forest University without prejudice for lack of personal jurisdiction and improper venue.


Dated: September 24, 2025

_____

SARA L. ELLIS
United States District Judge